**ARMOUR & CO. et al. v. CHICAGO, M., ST. P. & PAC. R. CO. et al.**

**CHICAGO, M., ST. P. & PAC. R. CO. et al. v. ARMOUR & CO. et al.**

No. 10259.

United States Court of Appeals Seventh Circuit.

March 29, 1951.

Rehearing Denied May 23, 1951.

Paul E. Blanchard, Frank J. Madden, William F. Price and Merrill Shepard, Frank W. Sullivan, Alexander T. Spare, John P. Staley, and Louis R. Simpson, all of Chicago, Ill., for appellant.

Pope & Ballard, Chicago, Ill., of counsel for Cudahy Packing Co.

Mayer, Meyer, Austrian & Platt, Chicago, Ill., of counsel for John Morrell & Co.

Carson L. Taylor, Albert B. Enoch, S. R. Brittingham, Jr., and Bryce L. Hamilton, all of Chicago, Ill., Edwin R. Eckersall, Elmer W. Freytag, P. F. Gault, James E. Goggin, C. W. Krohl, Edward H. Murnane, Joseph H. Wright, Campbell, Clark & Miller, and Winston, Strawn, Shaw & Black all of Chicago, Ill., of counsel, for appellee.

Before KERNER, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Plaintiffs appeal from the judgment entered in a case arising as a result of the consolidation, in the court below, of 248 constituent suits, 230 of which were actions by plaintiffs, shippers of fresh meats, against defendants, common carriers by railroad, to recover overcharges in freight rates, the shippers averring that the rates charged for transportation of specified carload shipments of meat exceeded the rates published in the applicable tariffs. The remaining 18 were actions by some of the same carriers against certain of the same shippers, in which the former sought to recover alleged undercharges on similar shipments. The parties stipulated that all issues presented in all cases be disposed of by determination of the applicable rates in eight selected representative shipments. The District Court concluded that, "under recognized principles of tariff construction", the applicable rate was, in each case, that for which the carriers contended, dismissed the 230 actions in which the shippers were plaintiffs and entered judgment for the carriers in the remaining 18 cases. This appeal involves the validity of the judgment disposing of 135 of the 248 original causes; these 135 cases include the 18 in which the carriers were plaintiffs and all are typified by five of the eight selected shipments designated as representative in the court below. It is the shippers' position that the judgment, insofar as it applies to the 135 cases involved in this appeal, was based on an erroneous construction of the applicable tariff provisions and should, therefore, be reversed and the cause remanded with directions to enter judgment in their favor in each of the constituent cases.

Each of the representative shipments moved from a point of origin west of the Mississippi River to a common destination, New York City. That all were governed by a rule known as the aggregate-of-inter-

mediates rule[1] is conceded, for it is uncontroverted that the aggregate of the separately established commodity rates applicable from Kansas City, South Omaha, Sioux City and South St. Paul, the respective points of origin of the representative shipments, to New York, their common destination, were lower than the corresponding through class rates between the same points. The shippers, however, contend that, by virtue of the operation of a second set of tariffs known as intermediate point rules, they were entitled, in each case, to an aggregate rate still lower than that assessed by the carriers pursuant to the aggregate-of-intermediates rule. Inasmuch as all of their claims follow a definite geographical and tariff pattern, the shippers' position with respect to any one representative shipment may be said to be typical of their position with respect to all, and may be illustrated by the argument made on their behalf with respect to representative shipment No. 2.

Shipment No. 2 moved from Kansas City via the Santa Fe to Lomax, Illinois, on the Mississippi River, thence via the Toledo, Peoria & Western to Sheldon, Illinois, and thence via the New York Central to New York. The rate actually paid was $1.21 per hundred pounds and was constructed, pursuant to the aggregate-of-intermediates rule, by adding a rate of 30 cents, applicable from Kansas City to East Fort Madison, Illinois, the Sante Fe's Mississippi River crossing, and a rate of 91 cents, applicable from East Fort Madison to New York. The shippers urge that the rate should have been $1.13, consisting of one of 30 cents from Kansas City to East Dubuque, Illinois, another Mississippi River crossing point, which rate was made applicable over a route designated as Santa Fe from Kansas City to Chicago and then on Chicago Great Western from Chicago back across the state of Illinois to East Dubuque on the Mississippi, a rate which the shippers contend also applied at Chicago as an intermediate point between Kansas City and East Dubuque, in combination with a rate of 83 cents from Chicago to New York. The 30 cent rate which the shippers seek to apply at Chicago as an intermediate point on a designated route from Kansas City to East Dubuque is published in Supplement 32 to W. T. L. Freight Tariff No. 1–X and is limited in application to "traffic destined Western Termini" and points east thereof, including New York. The rate is found in Section 1, which contains a provision that "When rates are published in this section on the commodity transported from point of origin to destination, rates named in this section will apply regardless of rates between the same points published in other commodity sections", and in which is incorporated a statement of the intermediate point rules on which the shippers' claims are based. There are two such rules, the intermediate origin rule[2] and the intermediate destination rule,[3] of which

1. This rule reads as follows: "If the aggregate of separately established (joint, local and/or proportional) rates applicable on intestate traffic contained in tariffs lawfully on file with the Interstate Commerce Commission applicable via any route over which the through rates published in this tariff apply, produces a lower charge on a shipment than the rates published herein, such aggregate of rates will apply via all routes over which the rates shown in this tariff are applicable, and the through rate published in this tariff has no application to that shipment."

2. "* * * Subject to the provisions of Notes 1, 2, 3 and 4 below, from any point of origin from which a commodity rate on a given article to a given destination and via a given route is not named in this section, which point is intermediate to a point from which a commodity rate on said article is published in this section, via a route through the intermediate point over which such commodity rate applies to the same destination, apply from such intermediate point to such destination and via such route the commodity rate in this section on said article from the next point beyond from which a commodity rate is published in this section on that article to the same destination via the same route. * * * "

3. "* * * Subject to the provisions of Notes 1, 2, 3 and 4 below, to any point of destination to which a commodity rate on a given article from a given point of origin and via a given route is not named

the latter is the more important for the purposes of this case.

The District Court found, with respect to Shipment No. 2, that, though the existence of the route contended for by the shippers was not disputed, both the Sante Fe and the Chicago Great Western had their own rails from Kansas City to Chicago, that East Dubuque is located some 170 miles northwest of Chicago, that a shipment from Kansas City to New York via the Sante Fe to Chicago would not pass over the rails of the Chicago Great Western, and that neither East Dubuque nor Chicago was the "destination" of Shipment No. 2 within the meaning of the intermediate destination rule; the court made similar findings of fact with respect to each of the other representative shipments here in controversy,[4] determined, contrary to the contention of the carriers, that it had jurisdiction of the consolidated suit and each of the constituent cases, and concluded that, under recognized principles of tariff construction, the shippers had failed to show any overcharges with respect to any of the representative ship-ments, that the rates claimed applicable by the carriers were correct, and that its conclusions to that effect were supported by (a) the practical construction of the tariffs by shippers, carriers and the Interstate Commerce Commission, and (b) the fact that the construction advocated by the shippers would result in an obvious maladjustment of rates, considering the rate structure in its entirety. The shippers assert that the court erred in so construing the tariffs, in failing to apply the intermediate destination rule to establish the western factor of the applicable rates, and in admitting evidence as to practical construction and as to the effect which the application of the intermediate point rules in the manner contended for by the shippers would exert on the rate structure as a whole. The carriers, although they defend the District Court's interpretation of the tariffs, still maintain that that court was without jurisdiction of the overcharge suits.

■■■ The doctrine of primary administrative jurisdiction which the carriers invoke to defeat jurisdiction of the over-

---

in this section, which point is intermediate to a point to which a commodity rate on said article is published in this section, via a route through the intermediate point over which such commodity rate applies from the same point of origin, apply to such intermediate point from such point of origin and via such route the commodity rate in this section on said article to the next point beyond to which a commodity rate is published in this section on that article from the same point of origin via the same route. * * *"

4.  Shipment No. 2–A moved from Kansas City to New York over the same route as Shipment No. 2. Instead of the $1.21 rate actually paid, the shippers contend the rate should have been $1.17½, composed of a 40 cent rate from Kansas City to Kokomo, Indiana, as an intermediate point between Kansas City and Hammond, and a rate of 77½ cents from Kokomo to New York.

Shipment No. 3 moved from South Omaha via the Milwaukee Road to Franklin Park, Illinois, thence via the Indiana Harbor Belt and New York Central to New York. The rate paid was $1.21 (30 cents from South Omaha to the Mil-waukee's Mississippi River crossing and 91 cents from the Mississippi to New York). The shippers say the rate should have been $1.13, composed of a 30 cent rate from South Omaha to Chicago, as an intermediate point between Omaha and East St. Louis, and a rate of 83 cents from Chicago to New York.

Shipment No. 4 moved from Sioux City via the Milwaukee Road to Franklin Park, thence via the Indiana Harbor Belt and New York Central to New York. The rate paid was $1.21. The shippers urge that it should have been $1.13 consisting of a 30 cent rate from Sioux City to Chicago, as an intermediate point between Sioux City and East St. Louis, and an 83 cent rate from Chicago to New York.

Shipment No. 5 moved from South St. Paul via the Milwaukee Road to Bensenville, Illinois, thence via the Indiana Harbor Belt and New York Central to New York. The rate assessed was $1.12. The rate claimed applicable by the shippers is a rate of $1.04, constructed by the use of a 21 cent rate from South St. Paul to Matteson, Illinois, as an intermediate point between St. Paul and Dubuque, Iowa, and an 83 cent rate from Matteson to New York.

charge suits, but which, they say, has no effect on the court's jurisdiction of the undercharge suits brought by them against the shippers, although they raise the very same questions as are presented in the overcharge suits, was announced by the Supreme Court in 1907, in Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 S.Ct. 350, 51 L.Ed. 553. The court there held that primary jurisdiction to determine *administrative* questions arising under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. in that case, a question as to the reasonableness of a specified established rate, is vested exclusively in the Interstate Commerce Commission. The scope of the doctrine was considered at length in Great Northern Ry. Co. v. Merchants Elevator Co., 259 U.S. 285, 291–294, 42 S.Ct. 477, 479, 66 L.Ed. 943, the court, through Mr. Justice Brandeis, stating:

"Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily *the determining factor is not the character of the function, but the character of the controverted question and the nature of the enquiry necessary for its solution.* To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly to be found only in a body of experts. But

*what construction shall be given to a railroad tariff presents ordinarily a question of law* which does not differ in character from those presented when the construction of any other document is in dispute.

"When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law. * * * *But where* the document to be construed is a tariff of an interstate carrier, and before it can be construed *it is necessary to determine upon evidence the peculiar meaning of words* or the existence of incidents alleged to be attached by usage to the transaction, the *preliminary determination must be made by the Commission;* and not until this determination has been made, can a court take jurisdiction of the controversy If this were not so, that uniformity which it is the purpose of the Commerce Act to secure could not be attained. For the effect to be given the tariff might depend, not upon construction of the language—a question of law—but upon whether or not a particular judge or jury had found, as a fact, that the words of the document were used in the peculiar sense attributed to them or that a particular usage existed.

"It may happen that there is a dispute concerning the meaning of a tariff which does not involve, properly speaking, any question of construction. The dispute may be merely whether words in the tariff were used in their ordinary meaning, or in a peculiar meaning. This was the situation in the [Texas & P. R. Co. v.] American Tie & Timber Co. Case, supra [234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255]. The legal issue was whether the carrier did or did not have in effect a rate covering oak ties. The only matter really in issue was whether the word 'lumber' which was in the tariff, had been used in a peculiar sense. * * *

"In the case at bar the situation is entirely different * * *. Here no fact, evidential or ultimate, is in controversy, and there is no occasion for the exercise of administrative discretion. The task to be performed is to determine the meaning of words of the tariff which were used in

608

their ordinary sense and to apply that meaning to the undisputed facts. That operation was solely one of construction; and preliminary resort to the Commission was, therefore, unnecessary. * * *" (Emphasis supplied.)

In the instant case, the situation is much like that in the Great Northern case. There is no controversy as to the facts. The sole question is one of construction, of determination of the meaning of the words of the tariff, none of which is alleged to have a "peculiar meaning", and the application of that meaning to the undisputed facts. Consequently, it seems clear that the question is one of law, of which the trial court properly held that it had jurisdiction. Cf. W. P. Brown Lumber Co. v. Louisville & N. R. Co., 299 U.S. 393, 397, 57 S.Ct. 265, 81 L.Ed. 301.

■ The crucial issue here turns on the construction of the intermediate destination rule published in the admittedly applicable tariffs. The shippers seek to apply this rule to obtain a rate between the point of origin of the shipment and a point which is not the destination of the shipment and which is, in fact, "intermediate" between the point of origin and the named basing point only by virtue of the existence of an extremely circuitous route. The carriers contend that this cannot be done and that the intermediate destination rule is applicable only in constructing a rate to a point which is the actual destination of the shipment. The shippers insist that the word "destination", as used in the tariffs, means not "destination of the shipment" but rather "destination of the rate".

The very fact that there are two inter-

mediate point rules, an intermediate origin rule and an intermediate destination rule,[5] might logically seem to indicate that, in constructing a combination rate, the intermediate origin rule is to be applied only to determine the initial rate factor, i. e., the rate to the named basing point from any point of origin on the route over which the rate applies, and the intermediate destination rule only to determine the terminal rate factor, i. e., the rate from the named basing point to any point of destination on the route over which the rate is made applicable.[6] While such an interpretation would be in accord with the carriers' contention, and the trial court's implied finding, that "destination", as used in the intermediate destination rule, means "destination of the shipment", the Commission itself, in El Rey Products Co. v. Alton & S. R. Co., 266 I.C.C. 525, has adopted an entirely different construction of the rules, sanctioning the use of the intermediate destination rule to determine the initial rate factor in a combination rate and the use of the intermediate origin rule to determine the terminal rate factor. The El Rey case involved a shipment originating in Poultney, Vermont, destined for Los Angeles. The applicable rate, as determined by the Commission, consisted of a local rate of $4.73 from Poultney to Terre Haute, Indiana, which rate was applied to Danville, Illinois, as an intermediate destination on an authorized route from Poultney to Terre Haute, and a proportional rate of $7.96 from Peoria to Los Angeles, which rate was applied from Danville as an intermediate point of origin on an authorized route between Peoria and Los Angeles. The opinion

5. See footnotes 2 and 3, supra.
6. The shippers themselves, in analyzing the language of the intermediate point rules, state, at page 25 of their brief: "The reason for the use of the words 'point of destination' and 'point of origin' in the body of the tariff rule is obvious. The Commission was simultaneously prescribing two rules, one of which required the application of the destination end of the rate to unnamed intermediate points along the route over which the rate applied, and the other required the applica-

tion of the origin end of the rate from unnamed intermediate points along the route over which the rate applied. To distinguish between the two portions of the rule the Commission referred to an intermediate 'point of destination' and an intermediate 'point of origin.'" But they contend that the Commission "did not establish a requirement that the traffic involved must be physically delivered by a shipper, or delivered to a consignee, at any such point before the intermediate rule would apply to establish a rate."

stated, properly, we think, that "Under the destination intermediate rule * * * the commodity rate of $4.73 * * * from Poultney to Terre Haute was made applicable at Danville" (226 I.C.C. at 526), and that "It is well settled * * * that the rule establishes from the intermediate point, not necessarily the origin of the shipment, from which a rate is not named, exactly the same kind of rate as authorized by the tariff from the named more distant point." 266 I.C.C. at 529.[7]

Though the fact that Chicago was not the destination of Shipment No. 2 would not, in the light of the Commission's decision in the El Rey case, preclude the application of the intermediate destination rule to Chicago, the express language of the tariff itself does seem to have that effect. In Section 2 of Tariff No. 1–X, Supplement 32, there is published a specific proportional rate of 40 cents, applicable to shipments of fresh meat from Kansas City to Chicago. While it is true, as the shippers point out, that Section 2 states that "Where rates are published in Section 1, the rates named in this section on the same commodity from and to the same points, via the same route, will not apply" and that Section 1 also provides that "When rates are published in this section on the commodity transported from point of origin to destination, rates named in this section will apply regardless of rates between the same points published in other commodity sections", the fact remains that there is, in Section 1, no *published* rate from Kansas City to Chicago and, consequently, nothing on which the quoted rules of priority can operate. The shippers seek to overcome this obstacle by saying that the word "published", as used in the tariff, does not mean "named" but rather "established", and that a rate from Kansas City to Chicago is "established" (and, hence, "published") by the operation of the intermediate point rule set out in Sec-

tion 1. But the language of the rules of priority, as well as that of the intermediate point rules, clearly indicates that "published" and "named" are used therein as synonyms. Thus, Section 1 provides that "When rates are *published* in this section * * * rates *named* in this section will apply regardless of rates * * * *published* in other * * * sections," and Section 2 states that "Where rates are *published* in Section 1, the rates *named* in this section * * * will not apply", and the intermediate destination rule is made applicable "to any point of destination to which a commodity rate * * * is not *named* in this section, which point is intermediate to a point to which a commodity rate * * * is *published* in this section * * *". (Emphasis supplied.) Consequently, there being no published Section 1 rate to take precedence over that published in Section 2, it follows that the named Section 2 rate was the applicable rate from Kansas City to Chicago.

Inasmuch as specific Section 2 rates were published between South Omaha and Chicago (Tariff 1–X), Sioux City and Chicago (Tariff 1–X), and South St. Paul and Matteson, Illinois, a point in the Chicago rate group (Tariff 5–R), as well as between Kansas City and Chicago (Tariff 1–X), the conclusion that the express language of the applicable tariff precludes the application of the intermediate destination rule in the case of Shipment No. 2 is equally applicable in the case of Shipment Nos. 3, 4 and 5. The result is that, irrespective of the admissibility or materiality of evidence as to practical construction or evidence of the effect on the entire rate structure of the adoption of the shippers' construction, the District Court correctly concluded that the shippers had failed to show any overcharges in the case of any of the aforementioned shipments.

▮▮ This conclusion is not, however,

---

**7.** The fact that both the words "origin" and "destination" appear in each of the intermediate rules tends to support the construction adopted in the El Rey case, for to attribute to those words the meaning contended for by the carriers would be to restrict the application of the rules to local shipments having both their points of origin and destination located on the route over which the specified rate is made applicable.

decisive of Shipment No. 2–A, for there is, in the applicable tariff (Tariff 1–Y), no specific Section 2 rate from Kansas City to Kokomo, Indiana. This shipment moved from Kansas City via the Sante Fe to Lomax, Illinois, thence via the Toledo, Peoria & Western to Sheldon, Illinois, and thence via the New York Central to New York City. The rate actually paid was $1.21, consisting of a rate of 30 cents from Kansas City to East Fort Madison and a rate of 91 cents from that point to New York. The shippers maintain that the rate should have been $1.17½, constructed by adding a rate of 40 cents, applicable from Kansas City to Hammond, Indiana, a point in the Chicago Switching District, which rate the shippers contend also applied at Kokomo, Indiana, as an intermediate point on an authorized route between Kansas City and Hammond, and a rate of 77½ cents from Indianapolis to New York City, which rate they contend also applied from Kokomo under the intermediate origin rule. The District Court, although finding that "the route used by the shippers for rate-making purposes was a specifically published route", rejected the shippers' contention that the 40 cent rate from Kansas City to Hammond which was published in Freight Tariff 1–Y could also be applied at Kokomo, doing so on the basis of its finding that Kokomo was not within the territory to which application of the rates named in that tariff was restricted by express provision on the tariff's title page.[8] The shippers urge that the court's reliance on the tariff's title page language was erroneous and that such language may not be construed as restricting the application of the intermediate point rules.

The shippers rely on the Commission's decision in Armour & Co. v. Chicago, B. & Q. R. Co., 215 I.C.C. 537, in which it was held that a general title page description of the territory for which rates were prescribed in the tariff did not have the effect of limiting the application of the intermediate point rules found in the body of the tariff to points within the territory generally described on the title page. In the course of its opinion, the Commission stated: "Intermediate rules are permitted to save carriers the expense of publishing specific rates from or to intermediate points, and to protect them against fourth-section violations. The rules are published voluntarily by *the carriers,* and they may *restrict them if they deem it advisable. The restriction, however, should be clear and not left to be inferred from the general provisions of the tariff or from the title page.*" (Emphasis supplied.) 215 I.C.C. 537 at 539. The Commission thus made it clear that the territorial application of the intermediate rules could be restricted but that such restriction must be clearly set forth and could not be *inferred* from general provisions or from the title page; it did not hold that the restriction might not be accomplished by an *express provision* appearing on the tariff's title page, nor was its holding in any way inconsistent with its previous announcement, in Procter & Gamble Distributing Co. v. B. & O. R. Co., 174 I.C.C. 350, 351, that "It is well settled that a tariff must be construed in its entirety, considering both the limitations on its title-page and the rules contained therein." In the case at bar, the title page of Tariff 1–Y recited that it established rates between a dozen designated cities "And other points in Illinois, Indiana, Iowa, Kentucky, Michigan (Northern Peninsula), Minnesota, Missouri and Wisconsin taking Group Rate Bases Nos. 1 to 8, inclusive (or arbitraries

---

8. The court's finding: "The title page of Tariff 1–Y defined the Indiana points covered by the tariff as 'points in * * * Indiana * * * taking Group Rate Bases Nos. 1 to 8, inclusive (or arbitraries higher), under Column 1 of W. T. L. Territorial Directory 1–C.' The only Indiana points named in Territorial Directory 1–C were points in the Chicago Switching District such as Hammond, and points on the line of the New York Central which runs along the western border of Indiana from the Chicago Switching District to Danville, Illinois. The same territorial limitation applied to the fresh-meat rate item in Tariff 1–Y. Kokomo is approximately 75 miles east of the group of Indiana points embraced within the territorial scope of Tariff 1–Y."

higher), under Column 1 of W. T. L. Territorial Directory No. 1–C * * *" ,and 19 designated cities west of the Mississippi River. This is not a *general* territorial description from which a restriction of the intermediate point rules is sought to be *inferred,* like that presented by the Armour case, 215 I.C.C. 537, but is a *definite statement* ,of the stations and points for which rates are prescribed in the tariff, which restricts the application .of the intermediate point rules, as well as any other rules contained in the tariff, to the construction of rates applicable from or to the stations and points designated on the title page and in the Territorial Directory which is incorporated by reference therein. Kokomo was not such a point. Consequently, the trial court's finding that Kokomo was not "within the territorial scope of Tariff 1–Y" and its rejection of the rate sought to be applied at Kokomo as an intermediate destination between Kansas City and Hammond properly disposed of the shippers' contentions with respect to Shipment No. 2–A.

As we have indicated, we find it unnecessary to consider the contention that evidence of practical construction of the tariffs involved was improper, for, irrespective of this evidence, the record was such that the District Court could properly have entered only the judgment it did.

The judgment is affirmed in its entirety.