RARDIN GRAIN COMPANY, Dewein Grain Company, Mt. Pulaski Grain Co., Tabor & Co., Blue Mound Grain & Fertilizer Co., Inc., Homer Grain Company, Walter Galloway d/b/a Watson Grain Company, Garnac Grain Co., Inc. (Midwestern Grain Company Division), Graham & Ragle, the Board of Trade of Kansas City, Missouri, Plaintiffs,

A. E. Staley Manufacturing Company, Pillsbury Company, Ralston Purina Company, Central Soya Company, Inc., and Corn Refiners Association, Inc., Intervening Plaintiffs,

v.

ILLINOIS CENTRAL RAILROAD COMPANY, United States of America and Interstate Commerce Commission, Defendants.

No. 4163.

United States District Court
S. D. Illinois, S. D.

Sept. 4, 1968.

Leslie N. Jones, Flora, Ill., Harold E. Spencer, Chicago, Ill., Robert G. Heckenkamp, Springfield, Ill., for plaintiffs.

William J. O'Brien, Jr., Chicago, Ill., Graham & Graham, Springfield, Ill., Leonard S. Goodman, Dept. of Justice, Washington, D.C., Richard E. Eagleton, U.S. Atty., Peoria, Ill., Gillespie, Burke & Gillespie, Springfield, Ill., for defendants.

## OPINION AND ORDER

ROBERT D. MORGAN, District Judge.

The complaint and intervenors' complaints herein pray a decree enjoining defendant, Illinois Central Railroad Company (hereinafter Central), from providing service under its Rent-a-Train Grain Tariff and compelling the defendant, Interstate Commerce Commission (hereinafter ICC), to expunge said tariff from its files.

The cause is before the court upon the motions of all plaintiffs[1] for summary judgment and the motions of defendants to dismiss the complaint for want of jurisdiction. The original complaint was filed in this court on December 22, 1967. It was referred to the undersigned on June 4, 1968, and the respective motions were argued at Peoria on June 24, 1968. Comprehensive and scholarly briefs have been filed in support of the respective positions.

The Court is convinced that the motions to dismiss must be allowed, and hence this opinion addresses itself only to the jurisdictional issue.

The applicable statutory provision is Section 6 of the Interstate Commerce Act. 49 U.S.C. § 6. That Act requires every common carrier to file with the ICC, and keep open for public inspection, "schedules showing all the rates, fares, and charges for transportation" between points served by such carrier. 49 U.S.C. § 6(1). It further authorizes the ICC to prescribe, by regulations, the form and manner in which such schedules shall be filed and published, and "the Commission is authorized to reject any schedule filed with it which is not in accordance with this section and with such regulations." 49 U.S.C. § 6(6).

Among the regulations promulgated by the ICC under the Act is its Rule 4(i), which requires that all tariffs state the rates for freight transportation by specific designation of the charge per ton, or other designated unit of weight or volume, for a commodity transported between designated points.

Upon Central's application, the ICC waived the applicability of its Rule 4(i) to the tariff in suit, whereupon the tariff was filed and published on October 27, 1967. Plaintiffs and others requested the ICC to suspend the tariff pending the determination of its legality. On November 24, 1967, the Board of Suspension of the ICC denied that request, but it ordered that an investigation be made to determine the legality of the tariff. An appeal of the Board's refusal of suspension was denied by the ICC. The tariff became effective November 29, 1967.

The tariff purports to state rates upon shipments of grain for export, in bulk, from all points upon Central's line in Illinois to five designated ports on the Gulf of Mexico.

Plaintiffs assert the illegality of the tariff's provisions which follow. All

---

[1]. Plaintiffs are elevator operators, grain dealers and an association of such operators and dealers. Certain grain processors have intervened as parties plaintiff. Since the interests of both the original plaintiffs and the intervenors are identical, the word "plaintiffs" is used in this opinion as a reference to both groups.

rates therein are stated upon the basis of a "rent-a-train" concept. Central proposes to make available to persons shipping grain between the above-mentioned points, for export, complete rental trains, each composed of necessary motive power and eighty-six covered hopper cars.[2] The base annual rental for each such train, if Central's cars are employed, is $1,000,000. A reduced base rental is provided if shipper-owned, or leased, cars are employed. In either event the tariff establishes a charge, in addition to the base rental, of 1.5 mills per ton-mile of transport, with a minimum charge of $5.00 per train mile, whether the train is loaded or empty. The tariff also provides that Central will maintain a guaranteed minimum train speed upon all one-way trips of 600 miles or more. It establishes a formula for imposition of a monetary penalty against Central for breaches of that guarantee.

Plaintiffs must concede that the ICC has primary jurisdiction to determine whether any tariff complies with the provisions of the Act. 49 U.S.C. §§ 6(6), 15(1). They must also concede that, in areas placed by Congress within the competence of the jurisdiction of the ICC, a controversy must first be submitted to that agency for decision, e.g., Arrow Transportation Company v. Southern Ry. Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52, subject to review by a three-judge district court. 28 U.S.C. §§ 1336, 2321–2325.

The logical consequence of those concessions is the refutation of the court's jurisdiction over this complaint. Plaintiffs, however, seek to avoid that logical consequence by their theory that the unique provisions of this tariff, as above summarized, render it "not a tariff" and thus, *per se,* illegal. They argue that Section 6 requires that uniform "rates"

be published by a succinct statement of the charge made per specified unit of transportation between designated points, that this tariff fails to establish rates so stated and so defined, that the tariff employs no terms of art which require ICC interpretation, that only questions of law are involved and that plaintiffs may invoke the general equity jurisdiction of this court since the cause presents a controversy arising under a statute regulating commerce. 28 U.S.C. § 1337.

That argument appears to this court to be an ingenious but invalid attempt to circumvent the statutory provisions governing the rate-making process. The Act contemplates that rates be established by the initiative of a carrier by its filing and publishing such rates with the ICC, 49 U.S.C. § 6, subject to the power of the ICC to reject and void any rate which it finds to be not in compliance with the Act and ICC rules, 49 U.S.C. § 6(6), and subject to the power of the ICC to suspend the effectiveness of any such rate for a limited period of time pending the hearing and disposition of proceedings by the ICC to determine the validity of the rates filed. 49 U.S.C. § 15(7). The ICC is vested with power, upon complaint or upon its own initiative, after an investigation and a full hearing, to set aside any rate or carrier classification which it finds to be unreasonable, unjustly discriminatory, unjustly preferential, or, in other manner, in violation of any provision of the Act. 49 U.S.C. § 15(1), (7).

The question of the validity of this tariff will depend upon the consideration of many factors. The tariff is limited to shipments of grain to specified ports for export. The effect upon the question of its validity of factual considerations peculiar to that phase of the industry cannot be known until full considera-

---

2. Provision is also made for Central to furnish, upon request and for an additional base rental, motive power and equipment for up to twenty-nine hopper-car units over and above the standard eighty-six car train. A per-car scale of base rental is provided for all trains composed of both Central's cars and shipper-owned cars.

tion has been concluded by the ICC. The ICC has ordered an investigation of this tariff, with hearings scheduled to have been commenced on April 22, 1968.

■ It is apparent that plaintiffs do have an administrative remedy which they have not exhausted. They are not now entitled to resort to the court for relief. E.g., F. C. C. v. Schreiber, 381 U. S. 279, 296–297, 85 S.Ct. 1459, 14 L.Ed. 2d 383; Arrow Transportation Co. v. Southern Ry. Co., 372 U.S. 658, 669–672, 83 S.Ct. 984, 10 L.Ed.2d 52; Director General of Railroads v. Viscose Co., 254 U.S. 498, 41 S.Ct. 151, 65 L.Ed. 372. They may obtain judicial review of any adverse decision in due course. 28 U.S. C. §§ 1337, 2321–2325.

■ That conclusion is not affected even if we assume that the "rent-a-train" concept is, in fact, invalid. A practice previously judicially determined to be illegal cannot be stricken down by judicial process when the practice is authorized by a published tariff and the question of the validity of the tariff provision has not been submitted to the ICC for decision. Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411, 421, 79 S.Ct. 1210, 3 L.Ed.2d 1334; compare, Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911. The Court held that it was necessary for the ICC to determine in the first instance whether factors peculiar to the industry in general, or affecting the publication of the particular tariff, would justify inclusion of the practice as a valid tariff provision. 360 U.S. at 421, 79 S.Ct. 1210.

It appears to the Court that the numerous cases upon which plaintiffs rely to support their position are simply not persuasive on the issue here.

This case does not involve a preferential contract, made in violation of a published tariff (Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681, and Chicago & Alton R. R. Co. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033); or the offering of a specialized service not authorized by any published tariff (United States v. Union Pacific R. R. Co., S.D.Iowa, 173 F.Supp. 397, aff'd per curiam 362 U.S. 327, 80 S. Ct. 737, 4 L.Ed.2d 766); or a carrier's variant "cost" (Cudahy Packing Co. v. Grand Trunk Western Ry. Co., 215 F. 93 (7th 1914)).

Other cited cases involved no issue as to the validity of a tariff. E. g., Hewitt-Robins, Inc. v. Eastern Freightway, Inc., 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142; Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208; United States v. Western Pacific R. R. Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126; Great Northern Ry. Co. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; National Van Lines, Inc. v. United States, 7 Cir., 355 F.2d 326; Lyons v. Illinois Greyhound Lines, 7 Cir., 192 F. 2d 533; Armour & Co. v. Chicago, M., St. P. & P. R. R. Co., 7 Cir., 188 F.2d 603.

■ Analysis of all such cases would serve no useful purpose. After an examination of authorities cited and careful consideration of all the nuances of argument by plaintiffs, the Court is convinced that it should not take jurisdiction of this proceeding in the light of the doctrine of primary jurisdiction even accepting the idea that there might be theoretical concurrent jurisdiction with ICC because of § 1337 of Title 28, United States Code. To do so would be to by-pass the administrative plan established by Congress, which gives ICC the first consideration of matters of this kind, subject thereafter to judicial review. The Court is unwilling to assert that power even though a scholarly argument can be made that such power exists. Judicial consideration of a "tariff" or a "rate" should await ICC conclusions with respect thereto. Judicial interference at this stage would only be disruptive of a regulatory program for which ICC is responsible.

It is therefore ordered that the motions of plaintiffs for summary judgment are denied. The motions of defendants to dismiss the complaint are allowed, at plaintiffs' cost.