# SOUTHWESTERN SUGAR & MOLASSES CO., INC., *v.* RIVER TERMINALS CORP.

No. 155.   Argued March 3, 1959.—Decided June 22, 1959.

Amos L. Ponder, Jr. argued the cause for petitioner. With him on the brief was Clem H. Sehrt.

Selim B. Lemle argued the cause for respondent. him on the brief was Carl G. Stearns.

MR. JUSTICE HARLAN delivered the opinion of the Court.

On September 24, 1944, the barge *Peter B,* carrying a cargo of molasses, sank in 30 feet of water at dockside in Texas City, Texas. Although the barge was eventually raised, the cargo, allegedly valued at some $26,000, was largely or totally lost.

Petitioner, Southwestern Sugar & Molasses Co., charterer of the barge and owner of the cargo, filed a libel against respondent, River Terminals Corporation, a water carrier certificated under Part III of the Interstate Commerce Act, 49 U. S. C. § 901 *et seq.,* seeking recovery of damages for the loss of cargo and for expenses occasioned in the raising and repair of the barge, which had been towed by respondent from Reserve, Louisiana, to Texas City and there berthed. The District Court first tried the issue of liability, separating the question of damages for subsequent determination, and held that the barge had sunk and the cargo had been lost as a result of respondent's negligence in the navigation or management of the tow and that respondent was liable for all damage to the cargo and for the cost of raising and repairing the barge.[1]   153 F. Supp. 923.

---

[1] The District Court found that the sinking of the *Peter B* was occasioned by the shipping of water through a crack in the starboard shell plate of one of its cargo tanks which had been discovered by petitioner's local manager while the barge was being loaded with molasses under his supervision, and that respondent's employees were negligent in various respects in failing to take proper precautions to avoid the sinking after it should have become evident that the barge was shipping water.

Respondent appealed from the interlocutory decree adjudging liability, 28 U. S. C. § 1292 (3), urging that the trial court had erred in holding (1) that petitioner had an interest in the *Peter B* sufficient to entitle it to maintain a libel for damage thereto, (2) that the sinking of the barge and loss of cargo were due to respondent's negligence, (3) that § 3 of the Harter Act[2] did not establish respondent's freedom from liability as a matter of law, and (4) that certain provisions in tariffs filed by respondent with the Interstate Commerce Commission, which purported to release respondent from liability for its negligence, and which were assumed by the District Court to have been applicable to the transportation here involved, were invalid as a matter of law and constituted no defense to the libel.[3]

The Court of Appeals did not consider any of the first three claims of error, although if sustained they would wholly have disposed of the case. Instead, the court directed its attention to respondent's contention that the exculpatory clause in respondent's tariff, incorporated by

[2] 46 U. S. C. § 192: "If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel . . . ."

[3] The pertinent provisions of the tariff provided:
"When shipments are transported in barges furnished by owners, shippers, consignees or parties other than the Carriers parties to this Tariff, such barges and (or) cargoes will be handled at owner's risk only, whether loss or damage is caused by negligence or otherwise.

"Presentation of a shipment in barge furnished by shipper, consignee or owner for movement on rates named herein shall constitute a guarantee to the Carriers parties to this Tariff that such barge is seaworthy and barge and cargo are in suitable condition for voyage in prospect. . . ."

reference in the bill of lading issued in connection with the transportation, must be given effect. The court concluded that because the clause was embodied in a tariff filed with the I. C. C. it could not in the first instance declare it invalid, but was bound to give it effect unless and until the Commission, after appropriate investigation, reached a contrary conclusion.[4] Accordingly, it reversed the judgment of the District Court "in order to afford . . . [petitioner] reasonable opportunity to seek administrative action before the Commission to test the validity of the challenged provision, otherwise to give full effect to the exculpatory clause . . . ." 253 F. 2d 922.

Petitioner sought certiorari, contending that the refusal of the Court of Appeals to strike down the exculpatory clause as a matter of law was contrary to the decision of this Court in *Bisso* v. *Inland Waterways Corporation,* 349 U. S. 85, where it was held that a clause in a private contract of towage purporting altogether to exculpate the tug from liability for its own negligence was void as against public policy. We granted the writ. 358 U. S. 811.

At the outset, we hold that the Court of Appeals erred in ordering what was in substance a referral of the issue of the validity of the exculpatory clause to the Commission without first passing on the other claims of error tendered by respondent below. As we have noted, those other claims, if accepted, would have required a reversal of the judgment of the District Court and the entry of judgment for respondent. The case had been fully argued before the Court of Appeals, and those claims were plainly ripe for decision.

---

[4] In reaching this conclusion the court relied on "the rule frequently stated by the Supreme Court that 'Until changed, tariffs bind both carriers and shippers with the force of law.' *Lowden* v. *Simonds-Shields-Lonsdale Grain Co.,* 306 U. S. 516, 520 . . . ; *Crancer* v. *Lowden,* 315 U. S. 631, 635 . . . ." 253 F. 2d 922, 925.

Under these circumstances, we think that sound and expeditious judicial administration should have led the Court of Appeals not to leave these issues undecided while a course was charted requiring the institution and litigation of an altogether separate proceeding before the I. C. C.—a proceeding which might well assume substantial dimensions—to test the sufficiency of only one of respondent's several defenses. If in consequence of findings made by the Commission in such a proceeding it should be determined that the exculpatory clause cannot be given effect, the Court of Appeals would then have to decide the very questions which it can now decide without the necessity for any collateral proceeding. Conversely, a present ruling on those other questions might entirely obviate the necessity for proceedings in the Commission which would further delay the final disposition of this already protracted litigation. We conclude, therefore, that the Court of Appeals should have passed upon those issues as to which the expert assistance of the I. C. C. is concededly not appropriate, before invoking the processes of the Commission.

Despite the fact that disposition of respondent's other claims by the Court of Appeals may ultimately render moot the question of the validity of the exculpatory clause as a defense in the circumstances of this case, we deem it appropriate now to review the holding of that court that the exculpatory clause was not void as a matter of law. Were the Court of Appeals on remand to decide the other questions tendered by respondent adversely to it, it would otherwise then be necessary for petitioner once more to seek review here on this very question. The issue is one of importance in the development of the law maritime, as to which we have large responsibilities, constitutionally conferred; it is squarely presented on the record before us; and the exigencies of this litigation clearly

call for its resolution at this stage. Accordingly, to this question we now turn.

In *Bisso* this Court held that a towboat owner might not, as a defense to a suit alleging loss due to negligent towage, rely on a contractual provision which purported to exempt the towboat altogether from liability for negligent injury to its tow. There a barge, while being towed on the Mississippi River by a steam towboat under a private towage contract, was caused by the negligence of those operating the towboat to collide with a bridge pier and sink. The Court reviewed prior cases in the field, and concluded that the conflict of decision found in those cases should be resolved by declaring private contractual provisions of the kind there involved altogether void as contrary to "public policy." The Court relied on "two main reasons" for its conclusion, (1) that such a rule was necessary "to discourage negligence," and (2) that the owner of the tow required protection from "others who have power to drive hard bargains." As was pointed out explicitly in a concurring opinion, the Court's decision was perforce reached without consideration of particularized economic and other factors relevant to the organization and operation of the tugboat industry.

Petitioner argues that *Bisso* is dispositive of this case, on the theory that an inherently illegal condition gains nothing from being filed as part of a tariff with the Commission.[5] We think that this reasoning begs the true

---

[5] Compare *Boston & Maine R. Co.* v. *Piper*, 246 U. S. 439, 445, where this Court held a limitation of liability clause void although filed as part of a tariff with the I. C. C. by a rail carrier, saying that: "While this provision was in the bill of lading, the form of which was filed with the Railroad Company's tariffs with the Interstate Commerce Commission, it gains nothing from that fact. The legal conditions and limitations in the carrier's bill of lading duly filed with the Commission are binding until changed by that body [citation] . . . but not so of conditions and limitations which are, as is this

question here presented, which is whether considerations of public policy which may be called upon by courts to strike down private contractual arrangements between tug and tow are necessarily applicable to provisions of a tariff filed with, and subject to the pervasive regulatory authority of, an expert administrative body. In *Bisso* the clause struck down was part of a contract over the terms of which the I. C. C., the body primarily charged by Congress with the regulation of the terms and conditions upon which water carriers subject to its jurisdiction shall offer their services, had no control. In the present case the courts below have assumed, and petitioner does not challenge, the applicability to the transportation which resulted in loss to petitioner of a duly filed tariff containing this exculpatory clause.

In these circumstances we would be moving too fast were we automatically to extend the rule of *Bisso* to govern the present case.[6] For all we know, it may be that

---

one, illegal, and consequently void." The decisive difference between *Piper* and this case is that there the exculpatory clause was specifically declared illegal by the Interstate Commerce Act itself. See 49 U. S. C. § 20 (11).

[6] It may be noted that the tug-tow relationship has not been assimilated by the law to that between a common carrier and shipper so far as liability is concerned. See, *e. g.*, *The Steamer Syracuse,* 12 Wall. 167. Thus although at common law a common carrier was liable, without proof of negligence, for all damage to the goods transported by it, unless it affirmatively showed that the damage was occasioned by the shipper, acts of God, the public enemy, public authority, or the inherent vice or nature of the commodity, *Secretary of Agriculture* v. *United States,* 350 U. S. 162, 165, n. 9, and cases cited, the District Court in the present case held that respondent could not be held liable in the absence of its negligence and petitioner did not assail that determination on appeal.

Part III of the Interstate Commerce Act has made tugboats common carriers for regulatory purposes under certain circumstances. See *Cornell Steamboat Co.* v. *United States,* 321 U. S. 634. Section

the rate specified in the relevant tariff is computed on the understanding that the exculpatory clause shall apply to relieve the towboat owner of the expense of insuring itself against liability for damage caused tows by the negligence of its servants, and is a reasonable rate so computed. If that were so, it might be hard to say that public policy demands that the tow should at once have the benefit of a rate so computed and be able to repudiate the correlative obligation of procuring its own insurance with knowledge that the towboat may be required to respond in damages for any injury caused by its negligence despite agreement to the contrary. For so long as the towboat's rates are at all times subject to regulatory control, prospectively and by way of reparation, the possibility of an overreaching whereby the towboat is at once able to exact high rates and deny the liabilities which transportation at such rates might be found fairly to impose upon it can be aborted by the action of the I. C. C. The rule of *Bisso*, however applicable where the towboat owner has "the power to drive hard bargains," may well call for modification when that power is effectively controlled by a pervasive regulatory scheme.[7]

320 (d) of that Act, 49 U. S. C. § 920 (d), explicitly provides, however, that the statute is not to be construed to affect "liabilities of vessels and their owners for loss or damage . . . ." The settled common-law rule that common carriers may not "by any form of agreement secure exemption from liability for loss or damage caused by their own negligence," *Sun Oil Co.* v. *Dalzell Towing Co.*, 287 U. S. 291, 294; *Railroad Co.* v. *Lockwood*, 17 Wall. 357; *Liverpool & G. W. Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, thus has no application here.

[7] Under Part III of the Interstate Commerce Act all "common carriers by water" as therein defined (see 49 U. S. C. § 902 (d)) are required to file with the Commission and keep open to public inspection "tariffs showing all rates, fares, charges, classifications, rules, regulations, and practices for the transportation . . . of . . . property" and stating "any rules or regulations which in anywise

Further, it may be noted that the clause relied on in this case is by its terms restricted to the situation where shipments are transported in barges furnished by others than the towboat owner. Whatever may be the considerations involved in forbidding a towboat to contract for exemption from liability for negligence in other circumstances, it may be that different considerations apply when the towboat moves barges which are delivered to it loaded, so that it never has an opportunity adequately to inspect them below the waterline, and which, if defective, may create emergency situations where a small degree of negligence can readily lead to very substantial monetary loss.[8] If the peculiar hazards involved in towing a barge supplied by the shipper are great, and the methods of guarding against those hazards uncertain, it may be that in an area where Congress has not, expressly or by fair implication, declared for a particular result, the federal courts should creatively exercise their responsibility for the development of the law maritime to

change, affect, or determine any part of the aggregate of such rates, fares, or charges, or the value of the service rendered to the passenger, shipper, or consignee." 49 U. S. C. § 906 (a). Contract carriers are subject to similar requirements. 49 U. S. C. § 906 (e). The Commission may suspend newly filed tariffs while it investigates them, 49 U. S. C. § 907 (g), (i), and may at any time initiate an investigation, upon complaint or on its own initiative, into the reasonableness of filed tariffs. 49 U. S. C. § 907 (b), (h).

[8] It is of course open to the I. C. C. to consider any other factors which it may deem relevant to the question of the propriety of exculpatory clauses in regulated towage tariffs, such as the availability to shippers of arrangements whereby use of the tower's barge, or payment of a higher alternative rate, results in an assumption by the tower of liability for its negligence, and the relative practicality and cost of the securing of insurance against the kind of risk here involved by shipper and by tower. We do not intimate any view as to the relative weight of the factors herein mentioned.

fashion a particularized rule to deal with particularized circumstances.[9]

We may assume that the question whether a clause of this kind offends against public policy is one appropriate ultimately for judicial rather than administrative resolution. But that does not mean that the courts must therefore deny themselves the enlightenment which may be had from a consideration of the relevant economic and other facts which the administrative agency charged with regulation of the transaction here involved is peculiarly well equipped to marshal and initially to evaluate. As was said in *Far East Conference* v. *United States,* 342 U. S. 570, 574–575, this Court has frequently recognized and applied

"... a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized com-

---

[9] Congress has in some instances declared by statute the circumstances under which carriers may contract for release from or limitation of liability, or rules governing the liability or exemption from liability of carriers irrespective of contract. See 46 U. S. C. §§ 181–196, 1300–1315 (water carriers); 49 U. S. C. §§ 20 (11), 319 (rail and motor carriers). Where such statutes apply of course no agreement in derogation of them, even if embodied in a tariff, is valid. See, *e. g., Adams Express Co.* v. *Croninger,* 226 U. S. 491; *Boston & Maine R. Co.* v. *Piper, supra.*

As we have noted above, respondent claims that § 3 of the Harter Act, 46 U. S. C. § 192, applies to exempt it from liability in this case irrespective of the effect given its tariff exculpatory clause. Be that as it may, the cited provision is ample demonstration that there is no general congressional policy requiring water carriers to be held liable for damage caused by the negligence of their servants in all cases.

petence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

We hold that the Court of Appeals correctly ruled that the exculpatory clause here at issue should not be struck down as a matter of law, and that the parties should be afforded a reasonable opportunity to obtain from the I. C. C., in an appropriate form of proceeding, a determination as to the particular circumstances of the tugboat industry which lend justification to this form of clause, if any there be, or which militate toward a rule wholly invalidating such provisions—regardless of the fact that the carrier which seeks to invoke them is subject to prospective and retrospective rate regulation. "Cases are not decided, nor the law appropriately understood, apart from an informed and particularized insight into the factual circumstances of the controversy under litigation." *Federal Maritime Board* v. *Isbrandtsen Co.*, 356 U. S. 481, 498. This principle has particular force when the courts are asked to strike down on grounds of public policy a contractual arrangement on its face consensual.

The case is remanded to the Court of Appeals with instructions to pass upon the first three assignments of error specified by respondent in its appeal from the judgment of the District Court. Should resolution of those issues not dispose of the case, the Court of Appeals is directed to remand the case to the District Court with instructions to hold it in abeyance while the parties seek

the views of the I. C. C., in any form of proceeding which that body may deem appropriate, as, to the circumstances bearing on the validity of respondent's exculpatory clause in the context of this litigation, and for further proceedings consistent with this opinion.

*It is so. ordered.*

THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS believe that the rule of law announced in *Bisso* should not be changed by the Interstate Commerce Commission, and would therefore reverse this judgment.