[L. A. No. 27588.   In Bank.   Aug. 11, 1964.]

E. B. ACKERMAN IMPORTING COMPANY et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES, Defendant and Respondent.

McCutchen, Black, Harnagel & Shea, Philip K. Verleger and Howard J. Privett for Plaintiffs and Appellants.

Roger Arnebergh, City Attorney, Arthur W. Nordstrom, Assistant City Attorney, Walter C. Foster, Deputy City Attorney, Trippet, Yoakum & Ballantyne and F. B. Yoakum, Jr., for Defendant and Respondent.

PEEK, J.—Plaintiffs appeal from a summary judgment in favor of defendant City of Los Angeles in an action brought

to recover for damage to plaintiffs' goods. The merchandise was stored in a transit shed located on a pier in Los Angeles Harbor, owned by the defendant city, and maintained by its harbor department.

Some of the plaintiffs' goods which had been placed in the shed were, on March 12, 1956, awaiting transfer for export to a vessel of the Grace Line, Inc., while the remainder of such goods had been unloaded from other ships of that carrier and were awaiting delivery to their consignees. On the above date a water pipe located beneath the floor of the shed broke. Water from the pipe flooded the floor of the shed and damaged the merchandise so stored.

Since 1946, and at the time of the accident, an agreement was in effect between the Grace Lines and defendant city whereby that carrier was given a "preferential berth assignment" for the use of the pier and shed in question.

Also in effect at the time of the accident was an agreement establishing the California Association of Port Authorities,[1] of which the Port of Los Angeles was a member. This agreement provided in article four that "A copy of each tariff effective hereunder containing all rates, charges, rules, classifications, regulations and/or practices, including additions thereto and changes therein, shall be furnished promptly to each member of the Association, and to the United States Maritime Commission, Washington, D. C., by the Association." This agreement was filed with and approved by the commission (now known as the Federal Maritime Commis-

---

[1]The objects and purposes of the Association were set out in the agreement as follows: ". . . to promote fair and honorable business practices among those engaged in the marine terminal industry, to more adequately serve the interests of the shipping public at their terminals in ports in the State of California and to establish and maintain just and reasonable, and, as far as practicable, uniform terminal rates, charges, classifications, rules, regulations and practices at such terminals for or in connection with interstate and foreign waterborne traffic, provided that it is recognized that each port or terminal may have a different situation and the term 'uniform' shall not necessarily be construed to mean identical, and it is understood that all matters involved herein shall be worked out in a spirit of bona fide effort to accomplish an arrangement that will give no one an undue advantage, taking into consideration all competitive conditions, and to cooperate with port authorities and marine terminal operators of other districts either individually or through their associations, to the end that the purposes set forth above may be achieved as widely as possible."

sion) pursuant to the Shipping Act,[2] and is designated as F.M.C. Agreement No. 7345.

Since 1951, and at the time of the accident, the pier facilities were operated by the Harbor Department in accordance with the provisions of the Port of Los Angeles Tariff No. 3, which was adopted pursuant to city ordinance and was thereafter filed with the Federal Maritime Commission. Under the terms of the tariff, fees for wharfage and wharf demurrage were charged against cargo which was in transit or storage and paid by the owners thereof to the carrier, who in turn remitted such charges to defendant city. Tariff No. 3 reads in part as follows: "Neither the Board [of Harbor Commissioners] nor the City shall be responsible or liable in any manner or degree for any loss or damage to any merchandise or other property of any description stored, handled, used, kept or placed upon, over, in, through or under any wharf or structure or property owned, controlled or operated by the Board or the City occasioned by or on account of pilferage, rodents, insects, natural shrinkage, wastage, decay, seepage, leaky containers, heating, evaporation, fire, leakage or discharge from sprinkler system, rain, floods, or the elements, collapse of a wharf or other structure, war, riots, strikes, or from any cause whatsoever, except to the extent that responsibility and liability shall be, regardless of the above limitations, absolutely imposed by operation of law."

Plaintiffs instituted the present action to recover for damages claimed to have been sustained because of the alleged negligence of defendant city. The trial court granted defendant's motion for summary judgment on the grounds that

---

[2]The Shipping Act, in 46 U.S.C. § 814, provides in relevant part as follows: "Every . . . person subject to this chapter, shall file immediately with the Commission a true copy . . . of every agreement with . . . [any] other person subject to this chapter . . . giving or receiving special rates, accommodations, or other special privileges or advantages; . . . or in any manner providing for an exclusive, preferential, or cooperative working arrangement.

"The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement . . . that it finds to be unjustly discriminatory or unfair . . . or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements. . . .

". . . . . . . . . . . .

"Any agreement . . . not approved, or disapproved, by the Commission shall be unlawful. . . ."

the exculpatory clause contained in Tariff No. 3 exonerated the city from liability, and that the city ''has not breached any duty owed by it to the plaintiffs or any of them.''

Plaintiffs here claim that the exculpatory clause contained in the tariff is invalid under the reasoning of this court in *Tunkl* v. *Regents of the University of California*, 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441], and that the summary judgment should be reversed for that reason. However, because we have concluded that primary jurisdiction relative to the issue is vested in the commission and that the parties should therefore be afforded a reasonable opportunity to obtain a determination from that body, we do not reach that issue.

In *Southwestern Sugar etc. Co.* v. *River Terminals Corp.*, 360 U.S. 411 [79 S.Ct. 1210, 3 L.Ed.2d 1334], a libel was filed against a water carrier seeking damages for loss of a cargo and for expenses incurred in raising and repairing a barge chartered by Southwestern Sugar and towed by the carrier from Louisiana to Texas, where it sank at dockside. The District Court found the carrier liable for all damages sought, but the Court of Appeals reversed the judgment and remanded with instructions to give effect to an exculpatory clause in a tariff filed by the carrier with the Interstate Commerce Commission[3] unless Southwestern should obtain from the commission within a reasonable time a ruling that the exculpatory clause was invalid.[4]

The Supreme Court agreed with the ruling of the Court of Appeals that the exculpatory clause should not be struck down as a matter of law and that the parties should be af-

---

[3]The carrier was a certificated common carrier under the terms of part III of the Interstate Commerce Act, 49 U.S.C. § 901 et seq., which was required to file tariff schedules with the Interstate Commerce Commission.

[4]Part III of the Interstate Commerce Act, in 49 U.S.C. § 907, provides that any person may initiate a hearing before the commission challenging ''any individual or joint rate, fare, charge, classification, regulation, or practice of any common carrier by water or any contract carrier by water.'' If, after hearing, the commission determines that such a rate, etc., ''is or will be unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, or otherwise in violation of any provision of this chapter, it may determine and prescribe the lawful rate, fare, or charge . . . thereafter to be observed, or the lawful regulation, practice, or classification thereafter to be made effective.''

forded a reasonable opportunity to obtain the views of the commission if, after consideration of the carrier's certain other claims of error, it were found that a determination as to the validity of the clause was necessary to the disposition of the case.

The court distinguished *Bisso* v. *Inland Waterways Corp.,* 349 U.S. 85 [75 S.Ct. 629, 99 L.Ed. 911], wherein it was held that a clause in a private contract of towage purporting to exculpate the tug from liability for its own negligence was void as against public policy, on the ground that considerations of public policy which might lead courts to strike down private contractual arrangements are not "necessarily applicable to provisions of a tariff filed with, and subject to the pervasive regulatory authority of, an expert administrative body." (*Southwestern Sugar etc. Co.* v. *River Terminals Corp., supra,* 360 U.S. at p. 417.) The court went on to show that its distinction was supported by a considerable difference: "For all we know, it may be that the rate specified in the relevant tariff is computed on the understanding that the exculpatory clause shall apply to relieve the towboat owner of the expense of insuring itself against liability for damage caused tows by the negligence of its servants, and is a reasonable rate so computed. If that were so, it might be hard to say that public policy demands that the tow should at once have the benefit of a rate so computed and be able to repudiate the correlative obligation of procuring its own insurance with the knowledge that the towboat may be required to respond in damages for any injury caused by its negligence despite agreement to the contrary. For so long as the towboat's rates are at all times subject to regulatory control, prospectively and by way of reparation, the possibility of an overreaching whereby the towboat is at once able to exact high rates and deny the liabilities which transportation at such rates might be found fairly to impose upon it can be aborted by the action of the I.C.C. The rule of *Bisso,* however applicable where the towboat owner has 'the power to drive hard bargains,' may well call for modification when that power is effectively controlled by a pervasive regulatory scheme." (*Southwestern Sugar etc. Co.* v. *River Terminals Corp., supra,* 360 U.S. at pp. 417-418.)

Finally, the court emphasized that the doctrine of primary jurisdiction is grounded in principles of comity and expedi-

tion, and is not in any strict sense a ''jurisdictional'' doctrine: ''We may assume that the question whether a clause of this kind offends against public policy is one appropriate ultimately for judicial rather than administrative resolution. But that does not mean that the courts must therefore deny themselves the enlightenment which may be had from a consideration of the relevant economic and other facts which the administrative agency charged with regulation of the transaction here involved is peculiarly well equipped to marshal and initially to evaluate.'' (*Southwestern Sugar etc. Co.* v. *River Terminals Corp., supra,* 360 U.S. at p. 420; Accord, *Far East Conference* v. *United States,* 342 U.S. 570 [72 S.Ct. 492, 96 L.Ed. 576]; 3 Davis, Administrative Law Treatise (1st ed. 1958) § 19.01, p. 1.)

The reasoning of the *Southwestern Sugar* case is equally applicable to the instant case and persuasive of a similar result. The fact that the tariff here filed was not required to be filed by statute[5] is of little consequence. The agreement by which the Port of Los Angeles and other signatories created the California Association of Port Authorities (F.M.C. Agreement No. 7345) was required to be filed with and approved by the commission. (46 U.S.C. § 814, *supra.*) That agreement provided that the tariff of each signatory should be filed with the commission. Though the statute requiring the filing of F.M.C. Agreement No. 7345 does not expressly require that tariffs of signatories be filed, it does provide that the commission's approval, which is necessary to the validity of the agreement, shall be withheld if the commission finds that an agreement filed with it is ''unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest.'' (46 U.S.C. § 814, *supra.*) Surely the commission could not make a determination of the scope here indicated without addressing itself to the situation

---

[5]The Shipping Act, in 46 U.S.C. § 817, requires that *common carriers by water* file their tariffs with the commission. No section of the Shipping Act expressly requires that any ''other person subject to this chapter,'' in which category terminal operators fall (*California* v. *United States,* 320 U.S. 577 [64 S.Ct. 352, 88 L.Ed. 322]), file its tariff with the commission.

of the respective signatories as they are revealed by relevant tariffs. Thus the standards outlined for approval of filed agreements implicitly require that signatories provide their tariffs to the commission.

Of similarly small consequence is the fact that the commission does not expressly by statute have the power to fix or control the rates charged by terminal operators.[6] (Cf. *Southwestern Sugar etc. Co.* v. *River Terminals Corp., supra,* 360 U.S. 411.) "By § 17 [of the Shipping Act, in 46 U.S.C. § 816] all those who are subject to the Act are under a duty to 'establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property.' When the Commission finds a breach of this duty, the same section authorizes it to 'determine, prescribe, and order enforced a just and reasonable regulation or practice.' The withholding of rate-making power for services other than water carriage does not qualify the unlimited grant to the Commission of the power to stop effectively all unjust and unreasonable practices in receiving, handling, storing or delivering property." (*California* v. *United States, supra,* 320 U.S. 577, 584.)

We therefore hold that the Federal Maritime Commission has primary jurisdiction over this cause, and hence that the parties should be afforded a reasonable opportunity to obtain from that body, in an appropriate proceeding,[7] a determination as to the particular circumstances of the California Association of Port Authorities, if any such there be, which might justify an exculpatory clause of the type here involved.

The summary judgment in favor of defendant is reversed, and the cause remanded to the trial court with instructions

---

[6]The Shipping Act, in 46 U.S.C. § 817, provides that *common carriers by water* shall "establish, observe, and enforce" reasonable rates and charges, and that whenever the commission finds that any rate or charge is unreasonable, it may "determine, prescribe, and order enforced a just and reasonable" rate or charge. No section of the Shipping Act expressly gives to the commission the power to regulate rates charged by any "other person subject to this chapter," in which category terminal operators fall. (*California* v. *United States,* 320 U.S. 577 [64 S.Ct. 352, 88 L.Ed. 322].)

[7]The Shipping Act, in 46 U.S.C. §§ 821-831, outlines the procedure whereby an aggrieved person can obtain a hearing concerning the reasonableness of a regulation.

to stay further proceedings until the parties have secured the indicated determination from the Federal Maritime Commission.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Tobriner J., concurred.

Appellants' petition for a rehearing was denied September 10, 1964.