MARYLAND PORT ADMINISTRATION, Plaintiff,

v.

SS AMERICAN LEGEND, in rem United States Lines, Inc., I. T. O. Corporation of Baltimore, SS ALBERT MAERSK, in rem A/S D/S Svendborg and D/S af 1912 A/S Maersk Line Agency, Inc. and John T. Clark and Son of Maryland, Inc., Defendants.

Civ. No. H–77–223.

United States District Court, D. Maryland.

July 3, 1978.

---

Robert L. Ferguson, Jr., Allen, Thieblot & Alexander, Frederick G. Savage, Robert R. Winter, Asst. Atty. Gen. of Md., of Baltimore, Md., for plaintiff.

Kieron F. Quinn, John H. West, III, and Ober, Grimes & Shriver, Baltimore, Md., for defendants SS AMERICAN LEGEND and U. S. Lines, Inc.

Donald A. Krach, Barrett W. Freedlander and Niles, Barton & Wilmer, Baltimore, Md., for defendant I. T. O. Corp. of Baltimore.

David W. Skeen and Skeen & Roach, Baltimore, Md., for defendants SS ALBERT MAERSK, A/S D/S Svendborg and D/S af 1912 A/S, and Maersk Line Agency, Inc.

R. Roger Drechsler and Lord, Whip, Coughlan & Green, Baltimore, Md., and Francis J. Gorman and Semmes, Bowen & Semmes, Baltimore, Md., for defendant John T. Clark & Son of Md., Inc.

ALEXANDER HARVEY, II, District Judge:

## MEMORANDUM DECISION

Presently pending in this case are numerous motions for summary judgment filed by the parties. Memoranda in support of and in opposition to the pending motions, together with voluminous exhibits and deposition excerpts have also been filed by the parties. After a review of these memoranda and other documents and after hearing argument in open court on some of the issues, this Court has concluded that all the pending motions should be denied at this time.

Plaintiff, Maryland Port Administration (hereinafter "MPA"), is an agency of the State of Maryland which owns and operates port facilities at the Dundalk Marine Terminal in the Port of Baltimore. This case arises out of a major accident which occurred at that terminal on March 21, 1976.

Briefly, it appears from the record that on that date, two container ships, the SS AMERICAN LEGEND and the SS ALBERT MAERSK, were berthed, or in the process of being berthed, in adjacent slips at MPA's facility and were in the process of being, or were about to be, unloaded through the use of MPA's container-handling cranes. The ALBERT MAERSK had docked at Berth No. 11 sometime during that morning, and at the time of the accident, was in the process of unloading containers through the use of two large cranes assigned to that berth, cranes Nos. 9 and 10. At the time of the accident, the AMERICAN LEGEND was in the process of tying up to the pier at Berth No. 12 and preparations were under way to begin using the two cranes assigned to that berth, cranes Nos. 11 and 12, for the purpose of unloading containers from the AMERICAN LEGEND.

At approximately 1:15 P.M., the two cranes assigned to the AMERICAN LEGEND were blown off the pier and into the water by a sudden high wind. At the same time, the two cranes assigned to the ALBERT MAERSK were blown down the pier, one crane striking the mast of the ALBERT MAERSK and the other striking the mast of the AMERICAN LEGEND. Needless to say, the movement of the cranes in this manner caused substantial physical damage to the two ships and to the two cranes that struck the ships, as well as the total loss of the two cranes that rolled into the water.

On February 15, 1977, MPA filed this suit under Rule 9(h), F.R.Civ.P. In its amended complaint, MPA named as defendants the following parties: (1) the AMERICAN LEGEND, in rem; (2) United states Lines, Inc., the owner of the AMERICAN LEGEND (hereinafter "U.S. Lines"); (3) ITO Corporation of Baltimore, the stevedoring firm hired by U.S. Lines to unload the AMERICAN LEGEND on the day of the accident (hereinafter "ITO"); (4) the ALBERT MAERSK, in rem; (5) A/S D/S Svendborg and D/S af 1912 A/S, the owners of the ALBERT MAERSK (hereinafter referred to collectively as "Svendborg"); (6) Maersk Line Agency, the ship's agent for the ALBERT MAERSK; and (7) John T. Clark & Son of Maryland, Inc., the stevedoring firm hired by Svendborg to unload the ALBERT MAERSK on the day of the accident (hereinafter "Clark"). The amended complaint is in three Counts: Count I seeks recovery under a theory of contract, based on certain MPA tariff provisions; Count II seeks recovery under a theory of tort, based on allegations of negligence; and Count III seeks recovery under a theory of contract, based on an alleged bailment.

The filing of the complaint and of the amended complaint led to a series of counterclaims, cross-claims and third-party claims filed by the various parties against each other. U.S. Lines has filed a counterclaim against MPA. This led MPA to file a third-party complaint against all the defendants other than U.S. Lines for indemnification. Svendborg likewise has filed a counterclaim against MPA, and MPA has likewise filed a third-party complaint against all defendants other than Svendborg for indemnification. Svendborg has also filed a cross-claim against its stevedore, Clark, and Clark has filed a cross-claim

against Svendborg. U.S. Lines has filed a cross-claim against both its stevedore, ITO, and against Clark. Finally, Clark has filed a counterclaim against MPA.

Each of the parties has now filed at least one motion for summary judgment with respect to the various claims or defenses asserted by it. This has created some difficulty for the Court in organizing the motions, in view of the number of parties and the number of claims. Most of the motions, however, share common issues. So the Court, rather than attempting to discuss each motion individually, ruled that the hearing should relate to the issues raised by the various motions.

As the Court views these issues, there are three primary ones ripe for decision at this point: first, whether admiralty jurisdiction exists as to the claims asserted by MPA against ITO; second, whether the counterclaims against MPA are barred by the Eleventh Amendment and the doctrine of sovereign immunity; and third, the construction, validity and application of the tariff provisions on which MPA relies.

At the outset of the hearing, this Court denied the pending motions insofar as they raised issues of whether ITO was negligent, whether the accident was caused by an Act of God, whether the damages claimed by the ships were foreseeable, whether there was evidence of a bailment, whether the tariff was void under Maryland law, and other questions that were raised by the motions. These motions were denied on the basis of the case of *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Company*, 381 F.2d 245, 249 (4th Cir. 1967).

## I

### *Admiralty jurisdiction*

ITO has moved to dismiss the amended complaint and for the entry of summary judgment on the grounds that the claims as to it are not within the Court's admiralty jurisdiction. The amended complaint against ITO states a cause of action in tort, for negligence, and in contract, for the alleged failure of ITO to honor its obligation under the risk of loss provision of the tariff. From the earliest times, courts have applied quite different tests for determining whether a tort action, on the one hand, and a contract action, on the other, are within the admiralty jurisdiction of a federal court. *See* 7A *Moore's Federal Practice*, ¶¶ .225 and .325 (2d Ed. 1977). Accordingly, the Court will analyze each cause of action separately.

### (a) *Tort*

■ As recently articulated by the Fourth Circuit in *Whittington v. Sewer Const. Co., Inc.*, 541 F.2d 427 (4th Cir. 1976), there are three situations in which admiralty jurisdiction will attach in a tort action:

> One who seeks to recover for injuries in a suit based upon admiralty jurisdiction must show (1) that his injuries occurred upon the navigable waters and had a maritime nexus, or (2) that the injuries were caused by a vessel in navigable waters or an appurtenance of the vessel, or (3) that the person injured was a seaman, a member of the crew of a vessel, injured in the course of his employment. 541 F.2d at 432.

Since this Court is satisfied that jurisdiction exists under the second test, it is not necessary to consider either the first or the third tests. The second test is based upon the Admiralty Extension Act, 46 U.S.C. § 740, which provides in part:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

The language "caused by a vessel on navigable water" has been construed to encompass not only accidents caused by a ship itself but also accidents caused by an appurtenance of the ship and accidents caused by the ship's personnel while operating the ship. *Gutierrez v. Waterman*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963).

Here, it is asserted by MPA that personnel of both ITO and U.S. Lines were negligent in the operation and supervision of the operation of cranes Nos. 11 and 12 and that this combination of negligence caused the damage to the cranes. In other words, MPA contends that ITO and U. S. Lines were joint tortfeasors.

The record here includes the deposition testimony of Captain Conlon, the master of the AMERICAN LEGEND, who testified that he had the authority to suspend unloading operations for reasons of safety and that he had received warnings of high winds on the morning of the day of the accident. This testimony establishes a factual dispute as to whether U.S. Lines was negligent in not suspending operations and whether it had a duty to suspend operations.

Thus, such evidence of negligence—and I am considering this evidence solely in the context of a motion for summary judgment—brings the action against U.S. Lines within the admiralty jurisdiction by virtue of the Admiralty Extension Act. *See Gutierrez v. Waterman, supra.* Plaintiff here relies on evidence that the ship is at fault by virtue of the negligent supervision by the ship's personnel of ITO personnel. The question is, however, whether evidence of joint fault also brings the action against ITO, the alleged joint tortfeasor, within the admiralty jurisdiction.

This precise question arose in *Gebhard v. SS Hawaiian Legislator*, 425 F.2d 1303 (9th Cir. 1970). In that case, a longshoreman brought suit against both the ship he was unloading and his employer, a stevedore company, alleging that both defendants had been negligent. The Court first held that the action against the ship came within the Admiralty Extension Act because the plaintiff had alleged that his injuries were caused by the negligence of the ship's personnel. The Court then discussed whether such a finding was sufficient to invoke jurisdiction as to the stevedore company. The Court stated, at pages 1306–07:

> The claim for negligence against the stevedoring company presents somewhat

different issues. The difficulty is that the allegations that would support jurisdiction are not the same as those that would support recovery. Jurisdiction must depend on the contention that the injury was "caused by a vessel"—*i. e.,* in the circumstances of this case, that the shipowner was negligent, *see* Part I, *supra.* But recovery turns on the allegation that the stevedoring company was negligent. Hence the question is whether the Extension Act, in giving jurisdiction over claims for injury "caused by a vessel," is restricted to jurisdiction over suits against the person responsible for the vessel's torts or whether it extends to all claims arising out of a vessel-caused injury, regardless of the parties sought to be charged.

We think the latter is the proper construction. The Act by its terms applies to "all cases" where the injury is "caused by a vessel on navigable water." It imposes no other requirements. On its face, therefore, the Act seems to base jurisdiction not on the character of the parties, as in diversity, but on the nature of the facts giving rise to the cause. And in view of the savings in time and money—both to litigants and to the courts—that result from consolidation in one action of all claims arising out of a single injury, we see no reason why we should depart from the literal meaning of the Act.

The few cases which have considered this point are in accord. *See Adams v. Harris County, Texas*, 316 F.Supp. 938 (S.D.Tex. 1970); *Fematt v. City of Los Angeles*, 196 F.Supp. 89 (S.D.Cal.1961); *Hovland v. Fearnley & Eger*, 110 F.Supp. 657 (E.D.Pa. 1952).

This Court is aware, of course, that a part of the *Gebhard* ruling has been overruled by the Supreme Court in *Victory Carriers v. Law*, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971).

In *Victory Carriers*, the Supreme Court held that a longshoreman could not bring suit in admiralty under the Extension Act against a ship for injuries he sustained on a pier while driving a fork lift truck owned

by his employing stevedore company. The Supreme Court held that the injury was not caused by the negligence of the ship's personnel but rather by the fork lift truck, which was not an appurtenance of the vessel. The *Gebhard* Court had reached a contrary result on similar facts. There, the Court had held that an injury to a longshoreman standing on a pier who was struck by a "straddle carrier" had been caused by the negligence of the vessel's personnel. It is this holding, and this holding alone, that was overruled by *Victory Carriers*. It was also this holding that was criticized by Judge Watkins in *Green v. Pope & Talbott, Inc.*, 328 F.Supp. 71, 86 (D.Md.1971), *aff'd* 459 F.2d 365 (4th Cir. 1972).

However, those cases are not material here. The facts here do support jurisdiction insofar as the ship is concerned. The Supreme Court has not overruled, as far as the Court knows, and no other court has disagreed with the second holding in *Gebhard*, which is that where an accident was caused by the negligence of a vessel within the meaning of the Admiralty Extension Act, admiralty jurisdiction will extend "to all claims arising out of a vessel-caused injury, regardless of the parties sought to be charged." As previously stated, evidence supporting the claim against U. S. Lines in this case is clearly sufficient (under a Rule 56 motion) to support a finding that the accident was caused by a vessel within the meaning of the Admiralty Extension Act. This Court would agree completely with the rationale of the *Gebhard* case, particularly under facts such as those we have here and in view of the many parties we have here with interrelated claims. Accordingly, this Court is satisfied that the tort action against ITO is within its admiralty jurisdiction by virtue of the Admiralty Extension Act.

### (b) *Contract*

With respect to the contract action, the issue is whether an express or implied contract between the owner of port terminal facilities and a stevedoring company for

the rental of container-handling cranes to unload a commercial cargo vessel is a maritime contract. No party has cited, and the Court has not found, any case directly addressing this issue.

As a general principle, whether a particular contract is a maritime contract within a federal court's admiralty jurisdiction is determined by the nature and character of the contract and its nexus to maritime activity, irrespective of the location of contract performance. See 7A *Moore's Federal Practice*, ¶ .225 (2d Ed. 1977). One commentator has said the following:

> The only question is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce on navigable waters.
>
> \*    \*    \*    \*    \*    \*
>
> If the nature and character of the contract is maritime, that is to say, if the contract is related to a maritime service or a maritime transaction, there is admiralty jurisdiction.

1 *Benedict on Admiralty*, § 182 at 11–5 (7th Ed. 1974).

In *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961), the Supreme Court noted:

> The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude and include certain common types of contracts.

It is well settled that a contract between a ship and a public or private pier owner for wharfage facilities is a maritime contract. *Thomson v. Chesapeake Yacht Club*, 255 F.Supp. 555, 560 (D.Md.1966). It is equally well settled that a contract between a ship and a stevedoring company for stevedoring services is a maritime contract. *Sanderlin v. Old Dominion Stevedoring Corp.*, 385 F.2d 79, 81 (4th Cir. 1967). In light of the general principles regarding maritime contracts as well as the similarity of the contract at issue here to stevedoring and wharfage contracts, this Court is satisfied

that the contract between MPA and ITO is a maritime contract and therefore within the Court's admiralty jurisdiction.

The Court would note that the contract between ITO and MPA is based upon MPA's Terminal Service Tariff which, as a matter of federal law, must be filed with the Federal Maritime Commission. *See* 46 U.S.C. §§ 816, 820, 841a; 46 C.F.R. § 533. Moreover, in its brief, ITO concedes that had U.S. Lines contracted with MPA to rent the cranes (also, of course, an issue which is factually in dispute), that contract would be maritime and within the admiralty jurisdiction. There is certainly no reason in logic or policy to deny admiralty jurisdiction where the cranes are rented to ITO for the purpose of unloading a ship of U.S. Lines but recognize admiralty jurisdiction where the cranes are rented directly to U.S. Lines itself for such unloading purposes. This Court is satisfied, for these reasons, that a maritime contract is involved here.

## II

### Sovereign immunity

MPA moves for summary judgment as to the counterclaims filed against it by U.S. Lines and Svendborg on the grounds that these claims are barred by sovereign immunity and the Eleventh Amendment. This Court is satisfied that these defenses have no application here.

■ The Court would note at the outset that by filing suit as a plaintiff, a state waives its immunity and Eleventh Amendment protection with respect to a counterclaim arising out of the same event which is the subject of the state's claim. *Gunter v. American Coastline R. R. Co.*, 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906); 3 *Moore's Federal Practice*, ¶ 13.19[2] (2d Ed. 1974). This type of waiver, however, is limited to a counterclaim asserted defensively in recoupment, for the purpose of defeating or diminishing a state's recovery, but not to a counterclaim asserted for the purpose of obtaining an affirmative judgment. *Fort Fetterman v. South Carolina State Hwy. Dept.*, 261 F.2d 563, 569 (4th Cir. 1958).

■ Aside from MPA's role as a plaintiff, it is the law in this Circuit that a state agency such as MPA waives the protection of sovereign immunity and the Eleventh Amendment when it enters the federally regulated domain of interstate and foreign commerce and engages in business of a proprietary or commercial nature. *Chesapeake Bay Bridge and Tunnel Dist. v. Lauritzen*, 404 F.2d 1001, 1003–04 (4th Cir. 1968); *see Dawkins v. Craig*, 483 F.2d 1191, 1195 (4th Cir. 1973). In two very recent cases, this rule was applied to hold that the Port Authorities of North and South Carolina are not immune from suits in federal court under admiralty jurisdiction. *Int'l Longshoremen's Ass'n v. North Carolina State Port Authority*, 511 F.2d 1007 (4th Cir. 1975); *Doris Trading Corp. v. SS Union Enterprise*, 406 F.Supp. 1093 (S.D.N.Y. 1976).

■ Here, it is undisputed that MPA sought and received the permission of the federal government to operate a port facility. It is undisputed that MPA is engaged in interstate and foreign commerce and that this commerce is subject to federal regulation, including regulation by the United States Army, Department of the Corps of Engineers and the Federal Maritime Commission. *See* 46 U.S.C. § 816. Finally, it is undisputed that MPA is engaged in the business of providing port and terminal facilities for hire, which is a commercial activity.

As the Fourth Circuit said in the *Int'l Longshoremen's Association* case, *supra*, 511 F.2d at 1008:

When state leaves its traditional governmental activity and enters upon a proprietary enterprise that is  *  *  * subject to congressional regulation, it subjects itself to that regulation as wholly as if it were a private person or corporation.

In this context, being subject to congressional regulation includes being subject to general suits in admiralty, pursuant to 28 U.S.C. § 1333. *See* the *Lauritzen* case, 404 F.2d at 1004. Accordingly, these counter-

claims brought under the general maritime jurisdiction alleging negligence are not barred by sovereign immunity or the Eleventh Amendment.

MPA contends that *Lauritzen*, which relied in large part on *Parden v. Terminal R. R. Co. of Ala.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), has been implicitly overruled or limited by the Supreme Court in *Employees v. Dept. of Public Health and Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). This Court does not agree. The Fourth Circuit has twice reaffirmed *Lauritzen* and distinguished *Employees v. Dept. of Public Health and Welfare*. *See Int'l Longshoremen's Ass'n v. North Carolina State Port Authority, supra*, and *Dawkins v. Craig, supra*.

It should also be noted that the legislation creating the MPA makes clear that the defense of sovereign immunity was expressly waived as to actions of this kind. In Trans. Art., *Ann. Code of Md.*, § 6–204(b), MPA is empowered to "sue and be sued in its own name." Although, by itself, such a provision is not always construed as an express waiver of sovereign immunity, *see O & B Inc. v. Maryland Capital Park and Planning Comm.*, 279 Md. 459, 369 A.2d 553 (1977), the enabling legislation goes further. Section 6–206(b) expressly disclaims all liability of MPA except liability "with respect to docks and wharves owned, controlled or operated by the Administration." By implication, liability arising out of MPA's ownership and operation of docks and wharves is not disclaimed. This implication is supported by the fact that the Maryland Legislature appropriated the sum of $174,108 for the payment by MPA of premiums for liability insurance, pursuant to the Trans. Art., *Ann.Code of Md.*, § 3–216(d). Taken together, these legislative enactments, in the opinion of this Court, constitute an express waiver of sovereign immunity and a commitment to provide funds for the payment of damages arising out of suits against MPA claiming liability with respect to its ownership and operation of docks and wharves. The combination of an express disclaimer of immunity and the provision of funds to pay a damage award is an effective waiver of sovereign immunity under Maryland law. *See, e. g., O & B Inc. v. Maryland Capital Park & Planning Comm., supra.*

## III

### The tariff provisions

■ All parties have moved for summary judgment, raising various issues concerning certain provisions in the MPA Terminal Services Tariff No. 3, effective October 15, 1975 (hereinafter referred to as the "tariff"). The tariff is a document drafted by MPA, setting forth the rates, terms and conditions with respect to the services MPA provides as a terminal operator. Under the provisions of the Shipping Act of 1916 and the regulations thereunder, the tariff must be filed with the Federal Maritime Commission (hereinafter referred to as the "FMC"). *See* 46 U.S.C. §§ 816, 820, 841a; 46 C.F.R. § 533.

The first two contested provisions purport to exculpate MPA from any and all liability arising out of its furnishing of terminal facilities. The first such provision is Section VII, Paragraph (2) of the tariff, which provides as follows:

> The Terminal Operator accepts no responsibility for damages or accidents occurring when its equipment and/or operator or employees are furnished to perform work for others.

The second such provision is Section VIII, Paragraph (4)B4, which provides:

> The terminal assumes no liability for claims, losses, costs or expenses by reason of property damage, personal injury or death which may result from the use of the crane, except that caused by structural or mechanical failure and not occasioned by an act or omission on the part of the party renting the crane.

The third and final contested provision is Section VII, Paragraph (3), which purports to impose liability for any damage to MPA's equipment upon the users of the equipment, regardless of the cause of the damages. It provides:

All persons to whom berths, wharves, transit sheds, mechanical equipment or other facilities have been assigned shall be responsible and liable to the terminal operator for any damage occurring to such property during their tenancy, occupancy, and/or use without regard to whom shall cause the damage.

MPA raises the first and second provisions defensively, as a defense to the counterclaims filed against it, and raises the third provision offensively, as the basis for its contract claim against the defendants.

The pending motions raise three broad issues concerning the tariff which overlap in part: first, the construction and validity of the provisions; second, the applicability of the doctrine of primary jurisdiction; and third, the application of the third provision to each defendant.

Basically, defendants contend that insofar as the tariff provisions in question purport to exculpate MPA from liability for its own negligence, they are unreasonable, against public policy and void as a matter of law. Defendants rely on a line of cases which have invalidated such provisions where the party seeking to claim the benefit of the provision enjoys a position of superior bargaining power and where the contractual relationship is colored by a public interest. *See, e. g., Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955); *Fairfax Gas & Supply v. Hadary*, 151 F.2d 939 (4th Cir. 1945). Defendants contend that the policy just stated also requires that the third provision be construed so as not to permit MPA to recover damages for injuries caused by its own negligence. Additionally, Clarke contends that the third provision should be construed as containing an implied exception for accidents caused by an Act of God.

In response, MPA raises among other issues the question of primary jurisdiction. MPA contends first that the FMC approved the tariff as a whole and that therefore the contested provisions are valid. Alternatively, MPA argues that any challenge to the contested provisions must be made before the FMC in the first instance.

Although, by regulation, the tariff must be filed with the FMC, *see* 46 C.F.R. § 533.3, the tariff need not be approved by the FMC and the mere filing does not constitute such approval. *See, e. g., Bird v. SS Fortuna*, 262 F.Supp. 24, 26 (D.Mass.1966). Accordingly, filing of the tariff with the FMC in no way constitutes an administrative determination that the tariff is valid or reasonable.

However, that is not to say that the FMC lacks the power to make such a determination. Pursuant to 46 U.S.C. § 816, "[w]henever the Commission finds that any [tariff] regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice." This power extends not only to ratemaking and charges but also to regulations and practices of terminal operators in connection with the furnishing of services and facilities. *American Export-Isbrandtsen Line, Inc. v. FMC*, 143 U.S.App. D.C. 366, 444 F.2d 824 (1970). Pursuant to 46 U.S.C. § 821, any aggrieved person may file a complaint with the FMC, challenging a particular practice or tariff as unreasonable. Indeed, it appears that there are two pending proceedings before the FMC considering the validity and construction of terminal tariffs filed by a public port authority as applied to liability to an injured third party. *See* FMC Docket Nos. 74–15 and 75–21. Apparently, MPA has intervened in the latter proceeding.

The doctrine of primary jurisdiction does no more than allocate initial jurisdiction between the administrative agency and the judiciary. It determines not which forum will finally decide an issue but only which forum will first decide an issue. *See* 3 Davis, *Administrative Law*, § 19.01 at 3 (1958). It is grounded on the notion that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952).

In *Southwestern Sugar & Molasses Co. v. River Terminal Corp.*, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959), the Supreme Court applied these principles to require that a challenge, similar to the one in this case, to an exculpatory provision contained in a tariff filed with the ICC be referred initially to the agency for consideration. The Supreme Court recognized the special need for initial administrative consideration there (which need is not present in an unregulated area of commerce) due to the possible interrelationship between the rate charged and the disclaimer of liability clause. The Supreme Court stated at pages 417–18, 79 S.Ct. at 1215:

> For all we know, it may be that the rate specified in the relevant tariff is computed on the understanding that the exculpatory clause shall apply to relieve the towboat owner of the expense of insuring itself against liability for damage caused tows by the negligence of its servants, and is a reasonable rate so computed. If that were so, it might be hard to say that public policy demands that the tow should at once have the benefit of a rate so computed and be able to repudiate the correlative obligation of procuring its own insurance with knowledge that the towboat may be required to respond in damages for any injury caused by its negligence despite the agreement to the contrary. For so long as the towboat's rates are at all times subject to regulatory control, prospectively and by way of reparation, the possibility of an overreaching whereby the towboat is at once able to exact high rates and deny the liabilities which transportation at such rates might be found fairly to impose upon it can be aborted by [administrative action.] The rule of *Bisso*, [349 U.S. 85, 75 S.Ct. 633] however applicable where the towboat owner has "the power to drive hard bargains," may well call for modification when that power is effectively controlled by a pervasive regulatory scheme.

In the two reported cases on point, this same rationale was applied in a strictly maritime context where a challenged exculpatory provision was part of a tariff filed with the FMC. *See Bird v. SS Fortune, supra; E. B. Ackerman Importing Co. v. City of Los Angeles*, 61 Cal.2d 595, 39 Cal. Rptr. 726, 394 P.2d 566 (Cal.1964), *en banc*. In both of those cases, as here, the mere filing of the tariff with the FMC did not constitute administrative approval.

After considering these authorities, this Court is satisfied that the FMC should have the first opportunity of determining the validity, reasonableness and construction of the three tariff provisions challenged here. The provisions in question are very important aspects of this suit insofar as all parties are concerned. An administrative determination of the possible interrelationship between the provisions of the tariff and the rates charged for terminal services would be of considerable assistance to the Court in finally deciding the questions raised herein. On this present record, the Court cannot now determine whether, and to what extent, the clauses are rate related. The fact that the Commission is presently considering the same or similar issues with other terminals suggests the possibility of a reasonably prompt decision. Accordingly, this Court will not at this time decide questions concerning the validity and construction of the contested tariff provisions. The parties may file further motions at a later date, following determination of these questions by the FMC. I do not conclude, as has been suggested, that the Court in this case is absolutely bound by any rulings of the FMC. What the Court wants is the FMC's interpretation of these provisions. The Court will then finally decide the legal questions presented under the particular facts of this case. Therefore, those defendants who wish to press these questions are instructed to file appropriate pleadings with the FMC within thirty days. Of course, the plaintiff would be entitled to then intervene in those proceedings to raise the points which plaintiff wishes to raise.

For all those reasons, the pending motions will be denied and the Court will enter an appropriate Order.