[Civ. No. 10247. Third Dist. Feb. 20, 1963.]

HAROLD F. BARUH et al., Plaintiffs and Respondents, v. ORVILLE J. KUHL, Defendant and Appellant.

267

Hadsell, Murman & Bishop, Richard S. Bishop, Aldo P. Guidotti and Douglas G. Cowan for Defendant and Appellant.

P. M. Barceloux, Burton J. Goldstein, Goldstein, Barceloux & Goldstein and Virgil O'Sullivan for Plaintiffs and Respondents.

PIERCE, P. J.—Plaintiffs recovered a judgment, after a jury verdict, for $20,500 compensatory and $5,000 punitive damages[1] against defendant Kuhl for the malicious and intentional flooding of a rice crop. The theory of plaintiffs' case was that defendant had first filled a duck lake on his land to, or beyond, capacity, and had then released the water therefrom onto plaintiffs' lands, defendant's motive being

---

[1] The jury returned a unanimous verdict for $23,533 compensatory and $20,000 punitive damages. Plaintiffs accepted the trial court's reduction to the amount above stated.

spite. Defendant's principal contention on appeal is the insufficiency of the evidence to support the judgment.

Appellant's briefs, however, seem designed to obtain a reweighing of the evidence by this court. Accepting, instead, our obligation to state the evidence with its reasonable inferences in a light most favorable to the party prevailing in the court below and to affirm if such statement shows substantial evidence to support the jury's verdict (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]), we find the following evidence in the record:

Plaintiffs' land on which the rice crop grew is the southernmost of three parcels all originally owned by defendant Kuhl. At the time of the alleged flooding, plaintiffs had just bought this land from Kuhl. North of plaintiffs' parcel, known as BZB Ranch, is a parcel owned by L. A. Yates, purchased by him from defendant. West of the Yates land is a 40-acre parcel retained by Kuhl when he sold to plaintiffs. He uses it in the fall for a duck lake. The only common boundary between BZB Ranch and Kuhl's land is in the southeast corner of the latter's parcel (the northwest corner of BZB Ranch).

Water to fill Kuhl's lake can come from two available sources: one, lateral F of Maxwell Irrigation District which enters Kuhl's property near the northwest corner. The second source of water is from a pump located in the southwest portion of the BZB Ranch near its south boundary which pumps water from a drain of Reclamation District 2047. This pump has a capacity of 7,500 gallons per minute. Pumped water is carried through an irrigation ditch northwesterly and thence north along the west boundary of BZB to the Kuhl property. The same pump and ditch are used to irrigate the rice on BZB. Located in the irrigation ditch at a point south of the Kuhl-BZB common boundary is a wooden structure called a stop box. It is 3.9 feet in width and has removable boards. Its purpose is, when closed, to stop water in the irrigation ditch to the north of said box from flowing to and through the outlet boxes and onto the fields of the BZB Ranch when the water is not desired for irrigation.

On September 16, 1953, Kuhl agreed to sell BZB Ranch to plaintiffs together with a growing rice crop. On September 21, 1953, at a meeting at the title company a dispute arose between Kuhl and plaintiffs regarding interest and an insurance policy. Kuhl became very angry, cursed plaintiffs, calling them "kikes," "S B Kikes," "city slickers." He said they were trying to cheat him, and called the deal off. A suit

by plaintiffs for specific performance followed. After plaintiffs had met Kuhl's demands regarding interest charges, the sale was completed and the suit was dismissed. Kuhl, however, admitted that he did not like plaintiffs because he had had to complete the sale involuntarily.

A story of the pending litigation had appeared in the Colusa newspaper. Apropos this account Kuhl wrote a letter to the editor. In it he accused plaintiffs of having "short-changed" him, of having tried "to gyp" him, of having brought a "phoney law suit" and he said: "There are still a couple of other chapters which I will clear up in the future."

Use of the word "chapters" had reference to a phrase, quoted by Kuhl from the earlier newspaper story: "another chapter in litigation involving Orville J. Kuhl." And indeed it appears that defendant Kuhl had been involved in other litigation. In addition to the suit for specific performance instituted by plaintiffs there had been extended litigation with Mr. Yates (which reached this court in *Yates* v. *Kuhl*, 130 Cal.App.2d 536 [279 P.2d 563]). It is understatement to say that as a result of this litigation Kuhl and Yates were bitter enemies.

A plaintiff-produced witness testified to two conversations with Kuhl, one on October 12, 1953, in which Kuhl stated that plaintiffs' property would be flooded, that Yates would flood it, that the water would come out of "his [Yates] duck ponds"; and the other on October 13th when Kuhl said, referring to plaintiffs, "The bunch of kikes are trying to do me" and "I'm going to do them"; also "I'm going to give them the works" and "he was going to break it off into them."

On October 13, 1953, Kuhl surrendered possession of the property to plaintiffs. The rice fields were then dry and ready for harvest. On October 22d, Henry Schmidt, who had "found" plaintiffs as purchasers of the BZB Ranch and who was to be plaintiffs' manager and harvest the rice crop drove out to the ranch. With him was plaintiff Samuel Bohne, one of the owners, and Gene Godon, a gravel contractor. The purpose of the trip was to specify road gravelling Godon was to do. The three drove to a point on the north boundary in the central portion of the ranch. They found that the whole area of the ranch in rice was under water. Bohne and Godon only observed it for a distance of 200 or 300 feet beyond the point of observation; Schmidt walked out

along a "contour," observed water 4 to 6 inches deep and over an area as far as he could see. The next day Schmidt returned with Yates and Edward Liss, a surveyor in the employ of Civil Engineer A. R. Helmkamp. (All were plaintiffs' witnesses at the trial.) They were trying to find the source of the water and drove down a road along the Kuhl-Yates common boundary as far as they could go. The road was awash, however, from the water in Kuhl's lake. The water was higher than Yates had ever seen it. They investigated and found the drain at the northerly line of Kuhl's property had been plugged by sacks filled with dirt to hold the water within the lake. Water was running from the Kuhl lake into the irrigation ditch described above. None of this water was coming from the Yates property and Surveyor Liss expressed an opinion based upon the relative water elevations that it would have been impossible for the water to have come from the Yates property. The three also inspected the stop box referred to above and found that three boards had been removed therefrom and that the dirt which had been backing the boards had been shoveled out. Grass in a shovelful of dirt was still green. The dirt was still fresh. Water from 7 to 9 inches deep was running through the opening in the stop box where the boards had been pulled. It was running through two outlet boxes and into plaintiffs' rice fields.

Within a day or two thereafter Schmidt returned with a laborer, closed up the stop box, started cutting checks and drained the rice fields wherever they could. They "went over the whole ranch that way." He testified: "Q. Now, in that connection, as a rice farmer and being familiar with rice growing and also with this property, did you do everything that you reasonably could to let that water drain off? [an objection was made and overruled and the witness answered.] A. We did, yes."

Meanwhile Schmidt had been to see Kuhl at the latter's trailer home located near his property. The visit was at 7:30 in the morning. Kuhl, fully clothed, greeted Schmidt with the demand: "What the hell you getting me out of bed at midnight for?" When Schmidt stated, "Well, do you know that you are running water on us up there off your gun club onto the B-Z-B Ranch," Kuhl replied: "No, I'm not doing that. Yates is doing it." At no time did Kuhl ever offer to go down and look at the flooded property.

He did, however, write two letters to Schmidt which are in

evidence, one written October 25, 1953, and another October 27th. These letters charge "Leo A. Yates, president of the Maxwell Irrigation District" with having blocked district drains for duck pond purposes and with being the cause of flood damage. It is to be noted, however, that both letters point to the fact that no water could reach the BZB Ranch if the stop box were closed.

In this connection Kuhl himself testified that he and his son had filled his lake by pumping water from the Reclamation District 2047 drain in 1953; that in doing so it was necessary to, and he had, opened the stop box by removing the boards and had not replaced them when the pumping operations had been completed; that the pump had been kept running continuously for three days and three nights; that he had been in Oakland when the pumping was going on, and he had wired his sons not to discontinue the pumping until his return; that when he did return, however, he found that Fred Young, whose 80 acres of rice adjoined plaintiffs' rice on the west, had previously shut off the pump. Kuhl fixed the time of doing this pumping a month ahead of the incidents involved in this litigation and he denied that any more water had been put in the lake. The testimony of plaintiffs' three witnesses as to the quantities found in Kuhl's lake on October 23d would contradict this.

The testimony of plaintiffs' witnesses as to water conditions on BZB Ranch October 22d was substantiated by testimony as to conditions found when an attempt was made later to harvest the rice crop. In this regard plaintiffs' principal witness, Schmidt, was corroborated by Lucius Fitch, a harvesting equipment operator and by Erving Stuart, one of his employees. Both stated conditions were so bad, the equipment mired down and after trying for four to six days to harvest the crop they had had to quit, leaving the equipment in the fields. They were able to get some rice out, perhaps 50 to 80 sacks per day where 250-350 sacks would have been normal. Fitch described conditions as "doggone muddy." Stuart testified: "We ran into water and mud so deep that we just couldn't go any further, and we had to have help to get us out, get the rigs out."

Much of the testimony during the nine-day trial (with a five-volume transcript of 1,329 pages) covered the quantity of damage (crop loss) suffered. Kuhl does not attack the damage award on appeal and we need not discuss it in this opinion.

Testimony produced by defendant, of course, sharply conflicted with plaintiffs' proof. Kuhl denied an excessive filling of the lake (in fact he said conditions in 1953 were subnormal). He denied a malicious opening of the stop box or that any wetting of the BZB Ranch occurred. He produced expert testimony from an able and experienced civil engineer that, given the respective elevations of the Kuhl lands, the irrigation ditch at its various levels, and the elevations at different points of the rice fields as set forth on the maps in evidence, the quantities of water claimed by plaintiffs' witnesses could not have had their origin in the Kuhl lake. This evidence, however, assumed no inflow from either of the two available sources, a possibility which could not be excluded.

At most this evidence merely created a conflict. And it manifestly did not outweigh, in the jury's opinion, the testimony of eight witnesses who *observed* excessive water conditions in the Kuhl lands, flowing through an irrigation ditch, with the aid of a recently opened stop box, and onto the plaintiffs' rice fields; nor did it overcome the evidence, also partially expert, that the duck lake on the Yates property, lower in elevation, was not a possible cause.

In urging that the evidence does not support the judgment, appellant Kuhl places first reliance upon *Showalter* v. *Western Pacific R.R. Co.,* 16 Cal.2d 460 [106 P.2d 895], which states the rule that where the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof and judgment must go against the party who has the burden of sustaining one of these inferences against the other. But the *Showalter* decision (quoting from *Weiand* v. *Southern Pac. Co.,* 34 Cal.App.2d 500, 504 [93 P.2d 1023]) also states (on page 476):

" ' . . . If, however, plaintiff has proven sufficient facts to justify a verdict upon *one* theory, the fact that there may be one or more seemingly rational explanations of the episode in no manner precludes a recovery or invalidates the verdict. These are mere matters of argument to be presented to the jury.' "

And the court in *Showalter* affirmed a plaintiff verdict.

Appellant argues that no evidence connected Kuhl with the flooding; that all that was proved was motive and opportunity. These, he states, are not enough. He cites no authority, but, assuming the rule's accuracy as a matter of

categorization, we find it inapplicable here. Opportunity in this case is conceded and the incidents which establish motive also add up to much more. They show, circumstantially, that defendant did the flooding. ▮▮ Both direct and indirect, or circumstantial, evidence may be relied upon to prove a disputed fact. (*Ignagni* v. *A. J. Peters & Sons, Inc.,* 147 Cal.App.2d 661, 663 [305 P.2d 953] ; 18 Cal.Jur.2d 478.) ▮▮ The circumstantial evidence connects defendant through the following reasoning process : First, substantial evidence which shows a deliberate flooding by someone, executed by needlessly raising the water in the Kuhl lake to an excessive height and then by releasing the water into a ditch, past a deliberately opened stop box. Secondly, these acts which served no legitimate or useful purpose necessarily must have been perpetrated by someone with an evil design. Thirdly, it may be doubted if anyone other than Kuhl could have raised the water in his lake to its capacity without his knowledge. (He lived at the scene.) Fourthly, the evidence shows conclusively that Kuhl, in a vengeful mood after litigation had compelled him to deed his ranch to plaintiffs, first made a veiled and, later, several open threats of flooding their lands. Next, he also, hating Yates, accused him of being the actor in the flooding, both before and after the event, an accusation which the jury was entitled to consider completely unfounded. Next, there were Kuhl's juvenile statements and bizarre behavior when Schmidt called upon him at his trailer. To these things may be added the suspicious circumstance of Kuhl's contradictory contentions —maintained even on this appeal : urging first that there was no flooding, while at the same time "demonstrating" a flooding for which Yates was responsible. Altogether this circumstantial evidence more than tips the scales to prove that the act of deliberate flooding done by someone, was, in fact, done by defendant. Substantial evidence supports the verdict.

The contention (again unsupported by cited authority) that plaintiffs violated a duty to mitigate damages cannot be sustained. This defense, which is an affirmative one, was neither pleaded nor did appellant sustain the burden of proof thereof which was his. (*Vitagraph, Inc.* v. *Liberty Theatres Co.,* 197 Cal. 694, 699 [242 P. 709].) Appellant points to the failure of Schmidt to replace the stop box boards immediately upon the discovery of their removal. Appellant's counsel brought this failure out on cross-examination but point-

edly refrained from seeking any explanation. Nor was it otherwise established that immediate replacement was either feasible or possible; or that crop damage would thereby have been lessened. On the other hand, it was proved (by plaintiffs) that, within a day or two after discovery of the cause of the flood, Schmidt did return with a laborer and did replace the boards and also did all that could be done to drain the lands.

In support of his last contention appellant cites the rule that evidence of other crimes should be excluded when offered solely to prove a criminal propensity on the part of an accused to commit the crime charged since its prejudicial effect on the jury exceeds its probative value (*People* v. *Channell,* 136 Cal.App.2d 99 [288 P.2d 316]), and he urges as grounds for reversal certain evidence admitted which he says violated that rule and certain arguments made by plaintiffs' counsel regarding such evidence which are called misconduct. We find it unnecessary to extend this opinion further to discuss these charges item by item. This was an action for malicious destruction of property. Evidence showing Kuhl's malice towards plaintiffs was not only proper, it was an indispensable part of plaintiffs' case. Evidence of Kuhl's malice towards Yates established plaintiffs' contention that in flooding the rice crop and blaming Yates therefor Kuhl was satisfying a desire to hurt both objects of his hatred with one act. Proof of Kuhl's quarrel with Schmidt over a real estate commission for the sale of the BZB property to plaintiffs was admissible as a part of the principal transaction involved. It also tended to add a third victim to those whom Kuhl desired to harm by flooding the crops. Other evidence impeached directly Kuhl's denials of his violent conduct and language. We have examined the contentions carefully and find that neither the evidence admitted nor arguments made by plaintiffs' counsel exceeded the rules of admissibility or bounds of propriety, considering the somewhat unusual web of circumstances here present.

The judgment is affirmed.

Schottky, J., and Friedman, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 17, 1963.