[Civ. No. 37159. First Dist., Div. Two. Dec. 20, 1976.]

MASONITE CORPORATION, Plaintiff and Respondent, v.
PACIFIC GAS AND ELECTRIC COMPANY,
Defendant and Appellant.

4

COUNSEL

Charles T. Van Deusen and Joseph S. Englert, Jr., for Defendant and Appellant.

Thomas S. Brigham for Plaintiff and Respondent.

OPINION

KANE, Acting P. J.—Defendant Pacific Gas and Electric Company (hereinafter appellant or P G and E) appeals from the trial court's judgment awarding respondent damages in the sum of $46,508 plus interest for breach of contract. The relevant facts may be summarized as follows:

By a written agreement executed September 28, 1966, appellant undertook to provide natural gas for respondent corporation, a commercial consumer, which maintained and operated a hardboard plant in Ukiah, California. Although respondent utilized gas for the dryer and space heaters, 99 percent of all gas supplied by P G and E was used for the three main boilers generating steam for the production of fiber and hardboard.

The computation of bills which lies at the core of the present controversy involved a relatively complex procedure consisting of several steps. First the raw cubic feet of gas (the so-called volume) had to be measured. This took place by a P G and E gas meter located on respondent's premises. The volume was recorded by an index which was attached to, and driven by, the meter. The index, in turn, drove a pen which recorded the volume "waves" on a circular flow chart. Second, the additional element figuring in the computation was the recording of the temperature and pressure of gas which was done by recorders also mounted on the meter. The third step was the addition of the gravity factor to the data above described by which the corrected volume of gas delivered to Masonite was calculated. The corrected volume was then

multiplied by the therm factor (the heating value of gas). The final figure appearing on the bill was the result of multiplying the therms (BTUs) by the applicable gas rates.

Although the instruments mentioned above were all supplied by P G and E, respondent, too, had meters of its own on each of the three main boilers. One of the meters measured the raw cubic feet of gas consumed, and the other set of meters measured the pounds of steam produced by respondent. Records of the gas and steam readings from Masonite's meters were kept on a regular basis, and Masonite's meters were inspected and calibrated by the manufacturer on November 11, 1971. Masonite also kept records of the board-foot production of the plant on a daily basis.

The gas bills of P G and E were excessively high for the months of November and December 1971. Based upon the readings of its own meters and the unchanged volume of production, respondent claimed that it had been overcharged for gas for the above noted months. After efforts to settle the dispute had failed, respondent initiated a lawsuit against P G and E in order to recover damages for the alleged overcharge.

At the ensuing jury trial, respondent presented evidence showing, inter alia, that its production records indicated no significant increase or decrease in the board-foot production for November and December 1971; that the readings of their own meters showed no appreciable change in pounds of steam produced or in the volume of gas used by the boilers in the months in controversy; that prior to the P G and E's testing of the meters the parties inspected the Masonite gas system for leaks and found none; and that in the disputed period the kilowatt-hour records indicated no significant changes in electricity usage by the plant. Finally, and most significantly, respondent introduced evidence to the effect that when about 1:30 p.m. on December 28, 1971, the original index was removed from the P G and E meter and replaced with a new index, the volume waves which previously had shown 10.6 per 12-hour period, immediately dropped to 6.4 for the same period and continued at that rate thereafter. In rebuttal, appellant furnished evidence that the tests carried out according to its own rules and regulations failed to show any inaccuracy in its metering, pressure recordation or billing process, and that there was no possible way for the meter or index to register inaccurately.

After receiving evidence and being instructed, the jury rendered a general verdict in favor of respondent, assessing damages in the sum of $46,508 plus interest.

Appellant does not dispute that the foregoing record amply supports the verdict of the jury. Appellant's principal contention on appeal, rather, is that the jury verdict should fail because a considerable portion of the evidence was inadmissible on the basis of irrelevancy. More precisely, appellant argues that respondent's theory of recovery was founded on breach of contract for failing to keep and maintain the gas meters and other facilities in good operating condition. Since the Public Utilities Commission (PUC) provided a comprehensive regulatory scheme for gas metering, testing and adjustment of bills for meter errors which preempted the field (cf. *Waters* v. *Pacific Telephone Co.* (1974) 12 Cal.3d 1 [114 Cal.Rptr. 753, 523 P.2d 1161]; Pub. Util. Code,[1] §§ 701, 702, 489, 1759), continues appellant, the *sole* permissible means of proving the meter accuracy or overcharge was in accordance with the pertinent regulatory provisions (Gas Rule, No. 17 (Rule 17) and General Order No. 58-A (Order 58-A),[2] and any other evidence showing meter inaccuracy, malfunction and/or overcharge was irrelevant and inadmissible as a matter of law. Appellant's position is untenable.

■ In the first place, the first amended complaint reveals without ambiguity that, contrary to appellant's contention, respondent's claim of breach of contract was predicated on *dual* grounds: one, appellant's

---

[1]Unless otherwise indicated, all references will be made to the Public Utilities Code of California.

[2]Order 58-A, section 23, states that "(a) *All tests to determine the accuracy of registration of any gas service meter shall be made with a suitable meter prover.*

"(b) Every gas service meter, when installed for the use of any customer, shall be in good order and shall have been adjusted to register within one (1) per cent over or two (2) per cent under the prover registration when passing gas at a rate which will cause a pressure drop in the meter of not to exceed one-half (½) inch of water column. The meter shall be adjusted so that the open flow test agrees with the check flow test within two per cent (2%), provided, however, that no meter shall be put in service which on any test proves in excess of one per cent (1%) over the prover registration. Any meter, the readings or records of which are gased on the differential pressure in such meter, or upon the measurement of any portion of the total gas delivered to a customer, shall be tested for accuracy before installation in a manner satisfactory to the Commission." (Italics added.)

Rule 17(B)(1) provides that "When, *as the result of any test*, a meter is found to be more than 2% fast, the Company shall refund to the customer the overcharge, based on the corrected meter readings for the period in which the meter was in use, not exceeding six months, unless it can be shown that the error was due to some cause, the date of which can be fixed. In this case, the overcharge shall be computed back to, but not beyond such time." (Italics added.)

alleged failure to keep accurate meters and related devices; two, a separate and distinct allegation that the overcharge occurred because appellant billed and collected money for gas actually not delivered to respondent.[3]

In the second place, appellant's basic contention, that by regulating the mode of meter testing and by providing for refund in case of overcharge the PUC preempted the field and that therefore no other additional evidence could be presented or received to prove damages, is unsupported by law or reason, and must be rejected.

We are, of course, well aware that the PUC as an expert administrative body has wide regulatory power with respect to public utilities which the courts generally may not abrogate (§ 1759;[4] *E. B. Ackerman Importing Co.* v. *City of Los Angeles* (1964) 61 Cal.2d 595 [39 Cal.Rptr. 726, 394 P.2d 566]). However, the commission does not have *exclusive* jurisdiction over any and all matters having any reference to the regulation and supervision of public utilities (*Product Research Associates* v. *Pacific Tel. & Tel. Co.* (1971) 16 Cal.App.3d 651, 655 [94 Cal.Rptr. 216]; *Vila* v. *Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469, 477 [43 Cal.Rptr. 654]). On the contrary, section 2106 expressly empowers the state courts to award both compensatory and (in a proper case) exemplary damages against the public utility for *all* damages, loss or injury resulting from any unlawful act or omission[5] (*California Adj. Co.*

---

[3]The pertinent portions of the first amended complaint are set out as follows: "By the execution of said agreement and the commencement of gas delivery to plaintiff, the defendant undertook and warranted to keep and maintain all such service regulators, meters, and facilities in good and accurate operating condition *and* to charge plaintiff only for natural gas which was actually delivered to plaintiff by defendant." (¶ IV.)

"Ever since August 1970, while defendant was selling and delivering natural gas to plaintiff *pursuant to the terms of said written agreement*, the defendant did, in violation of said written agreement, undertaking and warranty:

"a) *Fail to keep or maintain the* service regulators, *meters and associated facilities* for the delivery of gas to plaintiff *in good and accurate operating condition*; *and*

"b) *Overcharge plaintiff* $69,217 for gas delivered by defendant to plaintiff for said period, which amount plaintiff has heretofore paid defendant and which amount was charged to plaintiff by defendant *for gas which was not in fact delivered to plaintiff* by defendant." (¶ VI.) (Italics added.).

[4]Section 1759 provides that "No court of this State, except the Supreme Court to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, except that the writ of mandamus shall lie from the Supreme Court to the commission in all proper cases."

[5]Section 2106 provides that "*Any public utility which does*, causes to be done, or permits *any act*, matter, *or thing prohibited* or declared unlawful, or which omits to do any act, matter, or thing required to be done, either *by the Constitution, any law of this*

v. *Atchison etc. Ry. Co.* (1918) 179 Cal. 140, 145 [175 P. 682, 13 A.L.R. 274]; *Schultz* v. *Town of Lakeport* (1936) 5 Cal.2d 377, 383 [54 P.2d 1110, 55 P.2d 485, 108 A.L.R. 1168]; *Vila* v. *Tahoe Southside Water Utility, supra*).

■ In analyzing the issue at hand in the context of the foregoing premises, we initially underline that while the reasonable rates, rules and regulations of the commission do become a part of every contract between a public utility and its patrons (*Hischemoeller* v. *Nat. Ice etc. Storage Co.* (1956) 46 Cal.2d 318, 325 [294 P.2d 433]; *Sherwood* v. *County of Los Angeles* (1962) 203 Cal.App.2d 354, 359 [21 Cal.Rptr. 810]), the rights and duties of the contracting parties are determined by, and derived from, the underlying contract as a whole (*Gardner* v. *Basich Bros. Construction Co.* (1955) 44 Cal.2d 191, 194 [281 P.2d 521]). As a consequence, in resolving the rights and liabilities of the parties here, we may not look solely to the rules and regulations referred to by appellant, but rather must take into account and construe the *entire* contract.

The principles relating to interpretation of contracts are, of course, well established. ■ Preponderant among these rules are the following: all applicable law enters into and becomes a part of a contract by inference (*Traders etc. Ins. Co.* v. *Pac. Emp. Ins. Co.* (1955) 130 Cal.App.2d 158, 164 [278 P.2d 493]; *Cole* v. *Pacific Tel. & Tel. Co.* (1952) 112 Cal.App.2d 416, 418 [246 P.2d 686]; *Gardner* v. *Rich Mfg. Co.* (1945) 68 Cal.App.2d 725 [158 P.2d 23]); the whole of the contract must be taken together and effect be given to every part if reasonably practicable (Civ. Code, § 1641; *Harris* v. *Klure* (1962) 205 Cal.App.2d 574, 578 [23 Cal.Rptr. 313]); ambiguities in the contract, especially in exculpatory provisions, must be construed most strongly against the one who caused the ambiguity to exist, i.e., the drafter (Civ. Code, § 1654; *Milton* v. *Hudson Sales Corp.* (1957) 152 Cal.App.2d 418, 427-428 [313 P.2d 936]; *Basin Oil Co.* v. *Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 596 [271 P.2d 122]; see also *Transmix Corp.* v. *Southern Pac. Co.* (1960) 187

---

*State, or any order or decision of the commission, shall be liable* to the persons or corporations affected thereby *for all loss, damages, or injury caused thereby or resulting therefrom.* If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person.

"No recovery as provided in this section shall in any manner affect a recovery by the State of the penalties provided in this part or the exercise by the commission of its power to punish for contempt." (Italics added.)

Cal.App.2d 257, 267-268 [9 Cal.Rptr. 714]); the contract must receive such interpretation as will make it reasonable (Civ. Code, § 1643; *Kurland* v. *United Pac. Ins. Co.* (1967) 251 Cal.App.2d 112, 118 [59 Cal.Rptr. 258]); and lastly, there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which deprives the other of the benefit of the agreement (*Redke* v. *Silvertrust* (1971) 6 Cal.3d 94, 100 [98 Cal.Rptr. 293, 490 P.2d 805]; *Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 564-565 [212 P.2d 878]; *Harrison* v. *Cook* (1963) 213 Cal.App.2d 527, 530 [29 Cal.Rptr. 269]; *Bergum* v. *Weber* (1955) 136 Cal.App.2d 389, 392 [288 P.2d 623]).

■ When interpreted in light of the foregoing precepts, the agreement at bench must be held to include not only Rule 17 and Order 58-A, as appellant contends, but the pertinent provisions of the Evidence Code and the Public Utilities Code as well. The import of the incorporation of these codes in the agreement is quite obvious. On the one hand, the provisions of the Public Utilities Code make it explicit that no public utility may charge or receive a different compensation for any commodity furnished or service rendered than prescribed by the applicable rates or schedules in effect (§§ 494, 532),[6] and also that the party aggrieved is entitled to recover *all* damages or loss caused by the unlawful act of the public utility (§ 2106, *supra,* fn. 5). On the other hand, it is axiomatic that under the Evidence Code and the case authorities thereunder, both direct and indirect, or circumstantial, evidence may be relied upon to prove any disputed fact, including contractual or other damages (*Baruh* v. *Kuhl* (1963) 213 Cal.App.2d 266, 273 [28 Cal.Rptr. 573]; *Ignagni* v. *A. J. Peters & Son, Inc.* (1957) 147 Cal.App.2d 661, 663 [305 P.2d 953]; 31 Cal.Jur.3d, § 692, pp. 977-978).

Since under the rules of contract interpretation the Public Utilities Code, the Evidence Code, Rule 17 and Order 58-A simultaneously became implied terms of the same agreement, and since the respective provisions of the codes and the rules of the commission are in an apparent conflict, the narrow issue presented for determination is whether the rules of the commission take precedence over the wider

---

[6]Section 494 provides in part that "*No common carrier shall charge, demand, collect, or receive a different compensation* for the transportation of persons or property, or for any service in connection therewith, *than the applicable rates,* fares, *and charges specified in its schedules* filed and *in effect* at the time." Section 532 also sets out in pertinent portion that "Except as in this article otherwise provided, *no public utility shall charge, or receive a different compensation for any product or commodity* furnished or to be furnished, *or for any service rendered* or to be rendered, *than the rates,* tolls, rentals, *and charges applicable thereto as specified in its schedules* on file and *in effect* at the time . . ." (italics added).

provisions of the codes. We believe the answer to this question must be in the negative.

First, it is evident that the rules relied upon by appellant purport to limit P G and E's liability for damages in a rather ambiguous way. While the rules of the commission prescribe that the tests to determine the meter accuracy shall be made with a meter prover, they fail to specify whether other recognized methods of proving damages are also available or permissible and, even more significantly, they fail to spell out in clear and unmistakable terms that the general rules of evidence ought to be precluded in substantiating the meter inaccuracy and/or the overcharge of the customer, however occurred.[7] Thus, in the case at bench we are confronted with an exculpatory clause which is couched in ambiguous terms. Consequently, under established rules, we are bound to resolve the uncertainty or doubt against appellant, the drafter of the instrument, and hold that in the absence of a clearcut limitation appellant was liable for all damages caused to respondent (§ 2106), and that the damages stemming from the overcharge could properly be proven by any evidence admissible under the Evidence Code.

Second, the additional guidelines relating to the interpretation of contracts (i.e., the contract must be interpreted so as to make it reasonable; interpretation which would render a contract harsh, unjust or absurd must be avoided; the party may not be deprived of the benefit of his bargain under the guise of interpretation) supply added force to the conclusion reached above. It is plain from the statutory, regulatory and contractual provisions that the parties to the agreement at bench intended payment only for gas actually delivered. To construe the agreement otherwise and hold that by way of a vague limitation of proof P G and E obtained an inherent right to charge and retain money for a product or commodity in fact not delivered, would fly directly in the face of the equitable principles set forth above and would result in unjust enrichment on the part of P G and E. It is blackletter law that in this type of situation the aggrieved party, who has been deprived of the benefit of his bargain, gains an equitable right to recover under a quasi-contract theory. As the cases explain, the quasi-contract, or contract "implied in law," is an obligation created by the law without regard to the intention of the parties and designed to restore the aggrieved party to his former

---

[7]It appears clear that the overcharge, respondent's alternative theory of recovery, could have been caused by numerous factors: i.e., malfunction of the meter, index, pressure recorder, temperature recorder, leaks in the line between the meter and Masonite's side of the complex, incorrect meter readings, calorimeter malfunction, miscalculation of the factors comprising the billing formula, and so forth.

position by the return of the thing delivered or the money expended (*Kossian* v. *American Nat. Ins. Co.* (1967) 254 Cal.App.2d 647, 651 [62 Cal.Rptr. 225]; *Branche* v. *Hetzel* (1966) 241 Cal.App.2d 801, 807 [51 Cal.Rptr. 188]; 1 Witkin, Summary of Cal. Law (1973 ed.) § 28, p. 45).

We observe in passing that *Waters* v. *Pacific Telephone Co., supra,* upon which appellant so heavily relies, is clearly distinguishable from the case at bench. In *Waters,* the limitation upon the telephone company's liability was upheld because, unlike the case at bench, the limitation there was expressed in clear and unequivocal terms, and because the commission relied upon the validity of the limitation in exercising its rate-making functions (pp. 5, 10). Nothing similar has been shown in the instant case.

In light of our conclusion, appellant's remaining contentions do not require extended discussion. Thus, appellant's charge that the jury was improperly instructed and material instructions were improperly refused is based on the erroneous premise that the contractual rights and duties of the parties were determined solely by the specific provisions of Rule 17 and Order 58-A. Since we have resolved this issue contrariwise, appellant's claim must automatically fail.

Appellant's last argument, that due to the technical complexity of the matter the special interrogatories propounded by appellant should have been submitted to the jury and that the trial court's failure to do so constituted an abuse of discretion, similarly requires only a brief reply.

First of all, the purpose of a special finding of fact is to test the validity of a general verdict by determining whether all facts essential to its support were established to the satisfaction of the jury (*Plyer* v. *Pacific etc. Cement Co.* (1907) 152 Cal. 125, 130 [92 P. 56]; *Cembrook* v. *Sterling Drug Inc.* (1964) 231 Cal.App.2d 52, 63-64 [41 Cal.Rptr. 492]; *Bernson* v. *Bowman* (1960) 182 Cal.App.2d 697, 702 [6 Cal.Rptr. 455]). Our examination of the evidence along with the applicable legal principles convinces us that all facts necessary to support the general verdict here were adequately present; and, as a result, a favorable answer or answers to the special interrogatories would not have yielded a different or inconsistent general verdict. It is well recognized that in such a situation no cause for reversal is presented (*Pigeon* v. *Fuller* (1909) 156 Cal. 691, 697 [105 P. 976]; *Plyer* v. *Pacific, etc. Cement Co., supra* at p. 134).

Secondly, the giving of special interrogatories to the jury is addressed to the sound discretion of the trial judge and his determination is not

subject to review in the absence of a clear abuse of discretion (Code Civ. Proc., § 625;[8] *Mayfield* v. *Fidelity & Casualty Co.* (1936) 16 Cal.App.2d 611, 629 [61 P.2d 83]; *Cembrook* v. *Sterling Drug Inc., supra*). Appellant has failed to show such an abuse.

The judgment is affirmed.

Rouse, J., and Scott, J.,* concurred.

A petition for a rehearing was denied January 19, 1977.

---

[8]Code of Civil Procedure, section 625, provides that "In all cases the court *may* direct the jury to find a special verdict in writing, upon all, or any of the issues, and in all cases *may* instruct them, if they render a general verdict, to find upon particular questions of fact, to be stated in writing, and *may* direct a written finding thereon. The special verdict or finding must be filed with the clerk and entered upon the minutes. Where a special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court must give judgment accordingly." (Italics added.)

*Assigned by the Chairman of the Judicial Council.