[Civ. No. 45744. First Dist., Div. Two. July 8, 1981.]

GOLDEN SEDAN SERVICE, INC., Plaintiff and Appellant, v. AIRPORT LIMOUSINE SERVICE OF SUNNYVALE, INC., et al., Defendants and Respondents.

COUNSEL

Randall M. Widmann and Widmann, Adleson & Kelly for Plaintiff and Appellant.

Bernard B. Sinner for Defendants and Respondents.

OPINION

**MILLER, J.**—This appeal is taken by plaintiff Golden Sedan Service, Inc. (hereinafter Golden Sedan) from a judgment entered by the trial court against it and in favor of defendant Airport Limousine Service of Sunnyvale, Inc. (hereinafter Airport Limousine).

Evidence produced at a trial by the court revealed that Golden Sedan commenced operation in 1960 as a limousine service, operating without

a Public Utilities Commission (hereinafter P.U.C.) certificate of convenience and necessity. The business was incorporated in 1966 and the new corporation applied for a certificate to operate as a passenger stage that same year. The certificate of public convenience and necessity was subsequently granted in 1969. Mr. Ray De Noon, former president and 100 percent shareholder of Golden Sedan, testified that from 1960 until 1969 Golden Sedan was operating an airport limousine service without said certificate of public convenience and necessity and was charging its passengers on an individual fare basis. De Noon stated that he was told by the P.U.C. to continue operating from 1966 to 1969 pending a decision on the application. He said that it was P.U.C. policy that if an application was filed, a limousine operator could continue operations until a decision was made regarding the pending application.

At some point after Golden Sedan received its certificate of public convenience and necessity, several Golden Sedan employees left the company and started their own limousine company, servicing the same general area. On November 7, 1970, Airport Limousine was operating as a partnership; it was incorporated in September of 1971. At all relevant times Airport Limousine operated a limousine service, charging its customers on an individual fare basis.

On September 14, 1971, Airport Limousine filed an application for a certificate of public convenience and necessity with the P.U.C. The application was one of four filed with the P.U.C. within a six-week period, all by existing limousine services.[1]

Around November of 1971, Ralph and Doris Renna purchased Golden Sedan from Ray De Noon and his wife. Subsequent to acquiring control of Golden Sedan, Ralph Renna became aware, through a P.U.C. notice, that Airport Limousine had applied for a certificate of public convenience and necessity. Under its new management, Golden Sedan proceeded to file a formal protest against the Airport Limousine application. Additionally, Golden Sedan petitioned that the P.U.C. issue an interim order requiring Airport Limousine to cease and desist from performing unlawful services as a passenger stage corporation without authority.

---

[1] One of the three other applications was filed by Ralph and Doris Renna, doing business as "Charter Sedan Service, a division of San Jose Limousine Service." The Renna application was subsequently dismissed and the record is silent as to the reason.

On August 15, 1972, the P.U.C. filed an interim opinion denying Golden Sedan's request for a cease and desist order against Airport Limousine. The interim opinion noted that the commission was presently reviewing the entire airport limousine transportation business,[2] that Airport Limousine had an application for a certificate of public convenience and necessity under submission with the commission and Golden Sedan had not provided any evidence showing that the loss of traffic to Airport Limousine would result in either irreparable or serious financial harm.

On July 31, 1973, the P.U.C. granted Airport Limousine a certificate of public convenience and necessity. Thereafter, on November 7, 1973, Golden Sedan filed a complaint alleging that it had been damaged by Airport Limousine's "unlawful" operation which consisted of charging individual fares for limousine service for the three years prior to the time the complaint was filed.

The trial court concluded that at all relevant times Airport Limousine was operating under the jurisdiction and authority of the P.U.C. and that the conduct of Airport Limousine in charging individual fares did not constitute a sufficient basis for an action for damages under the purview of section 2106 of the Public Utilities Code.[3]

On appeal Golden Sedan contends that the trial court erred in concluding that Airport Limousine was operating at all relevant times under the jurisdiction and authority of the P.U.C. It argues that although Airport Limousine was under the jurisdiction of the P.U.C. because of its operations as a public utility and holder of a charter party permit, its activities as a passenger stage corporation charging individual fares could not be authorized until obtaining from the commission a certificate declaring that public convenience and necessity require such operation. We find this argument essentially correct.

Before beginning our analysis it is necessary to distinguish a "charter-party carrier of passengers" from a "passenger stage corporation."

---

[2]According to the interim opinion "[t]his investigation was undertaken because the breadth and degree of regulatory control over the airport limousine industry is apparently uncertain and confused, since there are two major groups in the industry: 'legitimate carriers' who submit to regulation, either statewide or local, and 'pirate carriers' who evade any regulation. [Citations.] The investigation is a fact-finding proceeding to ascertain possible regulatory solutions to these problems."

[3]All code sections will refer to the Public Utilities Code unless otherwise indicated.

Section 5360 defines a charter-party carrier of passengers as "every person engaged in the transportation of persons by motor vehicle for compensation, . . . over any public highway in this State." The P.U.C. issues a charter-party carrier permit where the carrier uses only vehicles under 15-passenger seating capacity. (Pub. Util. Code, § 5384, subd. (b).) A certificate of public convenience and necessity is not required to operate a charter-party carrier but, pursuant to section 5401,[4] charter-party carriers are prohibited from charging patrons on an individual fare basis. On the other hand, a passenger stage corporation is a common carrier which travels between fixed terminals or over a regular route. (Pub. Util. Code, § 226.) It generally charges individual rates for its service. (Pub. Util. Code, § 451 et seq.) Section 1031[5] requires a certificate of public convenience and necessity from the P.U.C. in order to operate as a passenger stage corporation.

It is apparently conceded that at all relevant times Airport Limousine had a charter-party carrier permit and, accordingly, was under the jurisdiction of the P.U.C. The critical issue is whether the company was *authorized* to operate a passenger stage corporation at that time.

Airport Limousine cites several general and regulatory statutes[6] but fails to explain how they justify its activities. It then argues that since the company had applied for a certificate to operate as a passenger stage corporation and because the P.U.C. was fully aware of the nature and extent of the company's activities yet refused to issue a cease and desist order, the company had authority to operate a passenger stage corporation.

---

[4]Former section 5401, applicable at the time of trial, provided: "Charges for the transportation to be offered or afforded by a charter-party carrier of passengers shall be computed and assessed on a vehicle mileage or time of use basis, or on a combination thereof, which charges may vary in accordance with the passenger capacity of the vehicle, or the number of persons to be transported, but it shall not be lawful for a charter-party carrier of passengers to directly or through his agent, or otherwise, or for a broker, to contract, agree, or arrange to charge or to demand or receive compensation for the transportation offered or afforded which shall be computed, charged, or assessed on an individual-fare basis, except schoolbus contractors who are compensated by parents of children attending public, private, or parochial schools."

[5]Section 1031 states in pertinent part: "No passenger stage corporation shall operate or cause to be operated any passenger stage over any public highway in this State without first having obtained from the commission a certificate declaring that public convenience and necessity require such operation,. . ."

[6]Sections 701, 1759, 226, 1031, 5353, 5375 and 5401.

Under section 1034[7] the issuance of a cease and desist order by the commission is discretionary. Failure to issue such order cannot be construed as authority to conduct activities that violate statutes. In the P.U.C. opinion granting a certificate of public convenience and necessity to Airport Limousine the commission specifically stated: "While the Commission does not condone the acts of charging individual fares under charter-party authority, we find that these acts, under the circumstances, do not render Airport or [other applicant] unfit to hold passenger stage operating authority. In this situation it is more important to bring those who wish to operate lawfully under the umbrella of full regulation than it is to perpetuate an undesirable situation." Thus, it is clear that although the P.U.C. was aware of Airport Limousine's activities, such conduct was not authorized.

Even if we were to find (and we do not so do) that the P.U.C.'s failure to issue a cease and desist order somehow constituted a ruling that Airport Limousine could operate as a passenger stage corporation without first receiving a certificate of public convenience and necessity, such ruling could not benefit Airport Limousine. ■ Where provisions of the Public Utilities Code and rules of the P.U.C. are in apparent conflict, the wider code provisions take precedence over commission rules. (*Masonite Corp.* v. *Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 9-10 [135 Cal.Rptr. 170].)

■ Moreover, the fact that Golden Sedan had previously operated as a passenger carrier corporation illegally does not negate the fact that Airport Limousine violated public utility law. Testimony by Golden Sedan's former president as to what he believed the P.U.C. policy to be is likewise unpersuasive in establishing that the commission authorized Airport Limousine's conduct.

■ The principal contention in Golden Sedan's appeal is that the trial court erred in finding that Airport Limousine's conduct did not constitute a sufficient basis for damages because of the ambiguity of Public Utility Code sections. We agree.

---

[7]Section 1034 provides: "When a complaint has been filed with the commission alleging that any passenger stage is being operated without a certificate of public convenience and necessity, contrary to or in violation of the provisions of this part, the commission may, with or without notice, make its order requiring the corporation or person operating or managing such passenger stage, to cease and desist from such operation, until the commission makes and files its decision on the complaint, or until further order of the commission."

In its findings of fact and conclusions of law the court concluded, "In view of the vagueness, uncertainty and the ambiguity *inter se* of Public Utilities Code Sections 702, 2106, 5401 and 5431, the conduct of defendants in charging individual fares does not constitute a sufficient basis for an action for damages under the purview of Public Utilities Code Section 2106." Section 702 provides that "[e]very public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees." As previously stated, we do not find that P.U.C.'s awareness of Airport Limousine's activities and failure to issue a cease and desist order constituted a ruling or decision that the company could legally operate as a passenger stage corporation without a certificate of public convenience and necessity. Accordingly, we see no ambiguity or vagueness when section 702 is read together with other sections.

On the other hand, section 2106 is clear and definite. The statute provides in part: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person." It is equally clear that section 5401[8] prohibits charter-party carriers such as Airport Limousine from charging passengers on an individual-fare basis.

In the instant action Airport Limousine did not obtain the status of a passenger stage corporation until July 31, 1973, the date when a certificate of public convenience and necessity was granted. Prior to that time the company was operating as a charter-party carrier of passengers and, in violation of section 5401, was charging individual fares. While we have no opinion as to the nature and extent of Golden Sedan's damages,

---

[8]See footnote 4.

we hold that Airport Limousine's conduct was unlawful under the purview of section 2106.

The judgment is reversed.

Taylor, P. J., and Rouse, J., concurred.